# Exhibit 2.3

SECRET//NOFORN

**ENCLOSURE**

This enclosure outlines the Investigating Officer's finding and recommendations, followed immediately by the Appointing Authority's action and comments on each respective finding.  A Table of Findings is provided for quick reference.

SECRET//NOFORN

SECRET//NOFORN

**TABLE OF FINDINGS**

1. (U//FOUO) The events of 4 October 2017 and the deaths of four U.S. and four Nigerien Soldiers were the results of the cumulative effect of a number of contributing factors, decisions, and deficiencies. CCDR: **Approved with comment.** ACTION: None

2. (U//FOUO) Operational constraints meant to minimize the likelihood of USSOF engaging in direct combat are insufficient; USSOF are planning, directing, and executing direct action operations. **Approved, in part with comment.** ACTION: AFRICOM

3. (U//FOUO) There are no clearly defined standards for the wearing of personal protective equipment during combat operations in Niger. **Approved.** ACTION: SOCAF

4. (S) Organizational failures at all echelons of command resulted in a lack of clear understanding of CONOPS development, approval, and notification requirements. Leaders did not share a common understanding of CONOPS categories or approval levels. Conflicting CONOPS approval matrices and a lack of approval and notification guidance for time-sensitive (b)(1) 1.4a resulted in ambiguity and a lack of effective notification for time-sensitive operations. **Approved with comment.** ACTION: SOCAF

5. (U//FOUO) Team OUALLAM was not equipped with a vehicle set that would afford them the operational flexibility to adjust equipment based upon changes to the battlefield. **Approved with comment.** ACTION: SOCAF, SOCOM

6. (U//FOUO) Prior to 4 October 2017, approximately half of Team OUALLAM had never conducted a collective training event with the team. **Approved as modified with comment.** ACTION: SOCAF, SOCOM

7. (U//FOUO) A perception of inflexible institutional policies and procedures resulted in a Relief in Place and Transfer of Authority (RIP/TOA) between (b)(3) / (b)(6) and (b)(3) / (b)(6) (b)(3) / (b)(6) that was rushed and inadequate. **Approved as modified with comment.** ACTION: SOCAF

8. (U//FOUO) The (b)(3) / (b)(6) Team Leader and Team Sergeant failed to conduct battle drill and pre-mission rehearsals prior to executing operations on 3-4 October 2017. **Approved with comment.** ACTION: SOCAF, SOCOM

9. (U//FOUO) The Team OUALLAM commander and AOB Niger acting commander failed to identify and implement adequate mitigation measures during the planning process of their initial mission. **Approved as modified with comment.** ACTION: SOCAF

10. (U//FOUO) The acting AOB Niger commander failed to coordinate for emergency CASEVAC and personnel recovery support with French and Nigerien partner forces prior to operations. **Approved with comment.** ACTION: AFRICOM, SOCOM, SOCAF

SECRET//NOFORN

SECRET//NOFORN

11. (U//FOUO) Air Forces Africa's (AFAF) ISR and PR response was hindered by limited operational planning and procedures, and a lack of coordination and synchronization with U.S. forces and partner nations. **Approved.** ACTION: SOCAF, AFAFRICA

12. (U//FOUO) The Team OUALLAM Commander, the acting AOB Niger Commander, the AOB Niger Operations Warrant Officer and SgtMaj failed to accurately characterize the mission that Team OUALLAM conducted in Tiloa to the SOCCE-LCB Commander. **Approved with comment.** ACTION: USSOCOM

13. (U//FOUO) Reports that the Tongo Tongo village elder intentionally stalled Team OUALLAM and their Nigerien partners to give the enemy time to attack are not supported by a preponderance of the evidence. **Approved.** ACTION: NONE

14. (U//FOUO) SSG Justin Wright, SSG Bryan Black, SSG Jeremiah Johnson, and SGT LaDavid Johnson died actively engaging the enemy and were not captured and executed. The enemy stripped their bodies of serviceable equipment and they were found partially clothed. **Approved with comment.** ACTION: NONE

15. (U//FOUO) SGT LaDavid Johnson did not have a Friendly Force Tracker (FFT) when he was separated from Team OUALLAM. **Approved with comment.** ACTION: SOCAF, SOCOM

16. (U//FOUO) Individual members of Team OUALLAM performed numerous acts of bravery on 4 October 2017. **Approved with comment.** ACTION: AFRICOM, SOCOM

17. (U//FOUO) The French and Nigerien aerial and ground response was instrumental in saving the lives of the remaining team members. **Approved with comment.** ACTION: AFRICOM

18. (S//NF) USAFRICOM's request for [(b)(1) 1.4a, (b)(1) 1.4c, (b)(1)1.4g] was not part of the standard processes and procedures used for Personnel Recovery (PR) events. **Approved as modified.** ACTION: AFRICOM JPRC

19. (S) [(b)(1) 1.4a, (b)(1)1.4g] and improper use of the mIRC battle management tool reduced situational awareness, caused confusion, and resulted in a disjointed crisis response. **Approved.** ACTION: SOCAF

20. (S//NF) The 4 October 2017 attack was not the result of an intelligence failure. Rather, limitations on [(b)(1) 1.4a, (b)(1)1.4g] activities in Niger contributed to Team OUALLAM's and the Intelligence Community's [(b)(1) 1.4a, (b)(1)1.4g] [(b)(1) 1.4a, (b)(1)1.4g] of an attack. **Approved as modified with comment.** ACTION: USAFRICOM J2

21. (U//FOUO) The response time of PR and CASEVAC did not affect the outcome of the events of 4 October 2017. **Approved as modified with comment.** ACTION: SOCAF, Service Components

SECRET//NOFORN

SECRET//NOFORN

22. (U//FOUO) USAFRICOM Personnel Recovery Command and Control system had not been thoroughly rehearsed to ensure a timely, effective, and integrated response during contingency operations in Niger. **Approved.** ACTION: AFRICOM

23. (U//FOUO) The contracted MEDEVAC/CASEVAC capability in Niger does not meet USAFRICOM's Personnel Recovery requirement for operations against VEOs operating in West Africa. **Disapproved with comment.** ACTION: NONE

4

SECRET//NOFORN

SECRET//NOFORN

**FINDING 1**

**(U//FOUO) INVESTIGATION FINDING 1**:  The events of 4 October 2017 and the deaths of four U.S. and four Nigerien Soldiers were the results of the cumulative effect of a number of contributing environmental, tactical, organizational, and institutional factors, decisions, and deficiencies.

(U) DISCUSSION.

(U//FOUO) On 4 October 2017, the enemy massed more than 100 well-trained and well-equipped fighters to attack Team OUALLAM and their Nigerien partners.  The enemy was the proximate cause of the death of U.S. and Nigerien Soldiers.

(U//FOUO) Notwithstanding the enemy's role in the events of 4 October 2017, this report identifies a number of other contributing factors.  Some of those factors contribute more strongly or directly than others, but the cumulative effect of all of the factors created conditions that allowed the attack.  Cumulative factors are diagramed on the following page in order of impact on the events of 4 October 2017.

(U//FOUO)  RECOMMENDATION:  None.  The majority of these factors are identified and analyzed elsewhere in this report and are presented here to demonstrate their cumulative effect.

SECRET//NOFORN



Classified By: General Thomas D. Waldhauser, Commander, U.S. Africa Command
Reason: 1.4(a)(b)(d)
Declassify On: 20430223

~~SECRET//NOFORN~~

## APPOINTING AUTHORITY ACTION

**(U) Finding 1 is approved with comment.**

*(U) COMMENT:* The investigating officer identifies the proximate cause of the Soldiers' deaths was the attack by a massed force of well-trained enemy fighters. This finding is approved.

(U) Although the report of investigation centers on the troops in contact (TIC) event, it is an exhaustive and comprehensive review of all relevant factors beginning with the unit sourcing prior to deployment through the TIC event and its aftermath. As a result, the investigation uncovered institutional, organizational, and individual shortcomings that must be addressed by the appropriate commanders. It is important for the chain of command at U.S. Special Operations Command and U.S. Special Operations Command Africa to review these factors and shortcomings and seek measures to improve the organizing, training, and equipping of their forces for deployment.

(U//~~FOUO~~) The TIC event was a result of the cumulative effect of a number of contributing factors. And although illustrative of this cumulative effect, the "weighting" of factors as outlined in the chart in Finding 1 may not be an accurate reflection of their relative causal relationship to the event. For example, blocks indicate "Mission Creep" and "Insufficient RIP/TOA with (b)(3) / (b)(6) (b)(3) / (b)(6) were strong contributing factors to the U.S. fatalities. These factors were certainly indicative of a larger issue of command oversight. However, the weighting of contributing factors may unnecessarily focus attention on one factor to the detriment of fully understanding others, or obscure the importance of the interaction of multiple and interconnected factors.

~~SECRET//NOFORN~~

SECRET//NOFORN

## FINDING 2

**(U//FOUO)  INVESTIGATION FINDING 2**:  Operational constraints meant to minimize the likelihood of USSOF engaging in direct combat are insufficient; USSOF in Niger are planning, directing, and executing direct action operations rather than advising Nigerien-led operations.

(U) DISCUSSION:

(S//NF) On 3 October 2017, the Executive Policy governing U.S. direct action against terrorists on the continent of Africa was codified in the "U.S. Policy Standards and Procedures for the use of force in counterterrorism operations outside the United States and areas of active hostilities," (CT-PPG).  Since 3 October, the President has issued new guidance on ⬛(b)(1) 1.4a⬛ ⬛(b)(1) 1.4a⬛ ⬛(b)(1) 1.4a⬛ The PSP supersedes the CT-PPG and makes substantive changes to the standards and procedures for approval of U.S. direct action missions, but the core principle remains the same:  decisions to use U.S. forces to conduct ⬛(b)(1) 1.4a⬛ will be made at the most senior levels after reasonable review and considerable oversight.

(U//FOUO) Advise, assist, and accompany operations that Team OUALLAM and Team ARLIT were conducting and AOB Niger was approving more closely resembled U.S. direct action than foreign partner-led operations aided by U.S. advice and assistance.  Team OUALLAM's initial mission was developed, planned, and executed entirely at the direction of the Team Commander and the AOB.  The subsequent re-missioning of Team OUALLAM and Team ARLIT was also developed, planned, and executed at the direction of USSOF.  No Nigerien partner forces were involved in the VTC directed by the SOCCE commander.

(S) Advise, assist, and accompany operations are authorized in CJCS EXORDS ⬛(b)(1) 1.4a⬛ ⬛(b)(1) 1.4a⬛ ⬛(b)(1) 1.4a⬛

(S) ⬛(b)(1) 1.4a, (b)(1) 1.4g⬛ the SOCAFRICA Commander permits USSOF to accompany foreign forces on operations including movement to contact, ambushes, and raids. ⬛(b)(1) 1.4a, (b)(1) 1.4g⬛

⬛(b)(1) 1.4a, (b)(1) 1.4g⬛

(S) ⬛(b)(1) 1.4a, (b)(1) 1.4g⬛

⬛(b)(1) 1.4a, (b)(1) 1.4g⬛

SECRET//NOFORN



SECRET//NOFORN

(S//NF)    (b)(1) 1.4a, (b)(1) 1.4g

(b)(1) 1.4a, (b)(1) 1.4g

(S)    (b)(1) 1.4a, (b)(1) 1.4g

(b)(1) 1.4a, (b)(1) 1.4g

(S) In the course of this investigation, members of [(b)(3) / (b)(6)] expressed a casual understanding of the [(b)(1) 1.4a, (b)(1) 1.4g] rule and an equally casual application of the [(b)(1) 1.4a, (b)(1) 1.4g] standard. During their raid on Objective NORTH, members of the SFODA trailed within [(b)(1) 1.4a, (b)(1) 1.4g] of the Nigerien assault force as the FAN assaulted across the last known location of [(b)(1) 1.4a]

(S//NF)    (b)(1) 1.4a, (b)(1) 1.4g

(b)(1) 1.4a, (b)(1) 1.4g

(U//FOUO) Missions described in this report and executed by Team OUALLAM and Team ARLIT were driven by U.S. intelligence, planned entirely by U.S. forces, and directed and led by USSOF. Nigerien forces had no input in the planning process or the decision to execute the missions.

(U//FOUO) This investigation revealed several problems with the advise, assist, and accompany activity as it relates to the CT-PPG and the PSP. Exercised conservatively, with advisors remaining far from the fight, advising higher echelon commanders, the policy could be executed in accordance with Presidential Policy. Exercised aggressively, with U.S. advisors

SECRET//NOFORN

SECRET//NOFORN

accompanying platoons, squads, and fire teams, the direct actions of our partners cannot be distinguished from U.S. direct action.  U.S. provisions of "advice and assistance" look more like U.S. direct combat operations that are not reported that way to Congress or acknowledged that way to the public.

(U) RECOMMENDATIONS:

(U//FOUO) Recommend USAFRICOM provide a clear and unequivocal standard to the force for advise, assist, and accompany operations that is consistent with Presidential Policy as it relates to U.S. direct action in Africa and ensure it is understood and enforced by Commanders.

(S) Recommend USAFRICOM consider [(b)(1) 1.4a] [(b)(1) 1.4a] [(b)(1) 1.4a] [(b)(1)1.4A, (b)(1)1.4g] [(b)(1) 1.4a, (b)(1)1.4g]

## APPOINTING AUTHORITY ACTION

**(U) Finding 2 is approved in part, with comment.**

*(U) COMMENT*:  This finding is a clear example of where leaders did not translate the strategic approach of "By, With, and Through" into appropriate tactical action.  U.S. commanders actively dominated the planning and execution of operations that should have been planned and executed more in conjunction with our partners, taking into account capabilities and limitations of our partner force.   Commanders in the SOCAFRICA chain of command need to ensure our supporting role is understood by all and continuously reemphasized.

(U) "By, With, and Through" refers to a strategic approach designed to achieve U.S. strategic objectives in Africa by enabling the security forces of partnered nations who have compatible strategic objectives.  This approach places an emphasis on U.S. military capabilities employed in a supporting role, not as principal participants in armed conflict.

- (U) Security operations are executed almost exclusively <u>by</u> the partnered security forces.

- (U) U.S. forces work <u>with</u> partnered security forces based on the operational needs of the partner.  U.S. forces' activities can include:

  - o (U) Training
  - o (U) Advising
  - o (U) Assisting (particularly in high-end, niche capabilities which the partnered force does not have)
  - o (U) Accompanying
  - o (U) Equipping
  - o (U) Developing security force institutions
  - o (U) Improving the professionalism of the partnered security force

SECRET//NOFORN

SECRET//NOFORN

- (U) The strategic objectives of both the U.S. and the partnered nation are achieved <u>through</u> a cooperative relationship in which U.S. Africa Command plays a supporting role.

(S) *COMMENT*:  With regard to the second recommendation suggesting AFRICOM (b)(1)1.4a/g _____ (b)(1) 1.4a _____ operations in relevant North and West African countries, I have considered this recommendation and do not believe ____ (b)(1)1.4a/g ____ s appropriate at this time. USAFRICOM executes the "By, With, and Through" framework _____ (b)(1) 1.4a _____ (b)(1) 1.4a These authorities enable USAFRICOM's support to the French in their counter terrorism efforts, _____ (b)(1) 1.4a _____ ____ (b)(1) 1.4a ____ Operations in the Sahel will continue to be African led, French assisted, and U.S. supported.  Should operational conditions change, I will certainly consider submitting a request for ____ (b)(1) 1.4a ____ authorities in accordance with established policy frameworks.

SECRET//NOFORN

SECRET//NOFORN

## FINDING 3

**(U//~~FOUO~~)  INVESTIGATION FINDING 3**:  There are no clearly defined standards for the wearing of personal protective equipment during combat operations in Niger.

(U) DISCUSSION:

(U//~~FOUO~~) The SOCCE-LCB Commander left uniform and PPE decisions to the discretion of SFODA Commanders citing differences in operating environments in his AOR.  Team OUALLAM exercised that discretion as follows:  crew-served weapons gunners normally wore helmets and ballistic plate carriers during movement while the rest of the team did not.

(U//~~FOUO~~) All team members donned their PPE for deliberate assaults like the assault on Objective NORTH.

(U//~~FOUO~~) Team OUALLAM's decision not to wear body armor during movement was due partially to the extremely hot climate in Niger, but it was also due to their belief that it was unlikely that the enemy would attack them.

(U//~~FOUO~~) RECOMMENDATION: Recommend Commander, SOCAFRICA and Commander, SOCFWD-NWA review PPE requirements in Niger to ensure they are appropriately tailored to the threat and issue a clearly defined standard for the wearing of PPE.

## APPOINTING AUTHORITY ACTION

**(U) Finding 3 is approved with no additional comment.**

SECRET//NOFORN

SECRET//NOFORN

**FINDING 4**

(S) **INVESTIGATION FINDING 4**:  Organizational failures at all echelons of command resulted in a lack of clear understanding of CONOPS development, approval, and notification requirements.  Leaders at SOCAFRICA, SOCFWD-NWA, SOCCE-LCB, AOB Niger, and (b)(3) / (b)(6) did not share a common understanding of CONOPS categories or CONOPS approval levels in Niger.  Conflicting CONOPS approval matrices and a lack of approval and notification guidance for time-sensitive (b)(1) 1.4a at the SOCAFRICA and SOCFWD-NWA commands resulted in ambiguity and a lack of effective notification for time-sensitive operations.

(U) DISCUSSION:

(U//FOUO) Lack of Clear Understanding of CONOPS Development, Approval, Notification Requirements.

(S) Commander, SOCAFRICA published a CONOPS Standard Operating Procedure (SOP) via command message traffic on 28 September 2016.  This SOP delegated to the Commander, SOCFWD-NWA approval authority for (b)(1) 1.4a CONOPS and permitted further delegation of approval authority to the "O-5 Level."  This SOP required notification of approved (b)(1) 1.4a FRAGOs to the SOCAFRICA J33 and JOC "in order to maintain situational awareness."  The SOP did not establish a timeline for this notification.

(S) Separate from the CONOPS SOP message, SOCAFRICA generated a CONOPS Approval Matrix that included a (b)(1)1.4a notification requirement for (b)(1)1.4a CONOPS and (b)(1)1.4a FRAGOs.  Despite the very nature of a (b)(1) 1.4a FRAGO (b)(1) 1.4a contemplating time-sensitive operations, SOCAFRICA did not implement any processes to account for time-sensitive or real-time approvals.

(S) Although SOCAFRICA's (b)(1) 1.4a notification requirement for (b)(1)1.4a CONOPS and (b)(1) 1.4a FRAGOs was not articulated in the formal SOP, the requirement was seemingly acknowledged and adopted by SOCFWD-NWA.  SOCFWD-NWA developed and implemented a new CONOPS approval matrix that also included a (b)(1) 1.4a notification requirement to SOCAFRICA for approved (b)(1) 1.4a CONOPS and (b)(1) 1.4a FRAGOs.  Like SOCAFRICA, SOCFWD-NWA did not implement any processes to account for time-sensitive or real-time approvals.  In the absence of clear guidance from SOCAFRICA as to the approval and notification process for time-sensitive missions (those planned and executed within (b)(1) 1.4a ), the SOCCE-LCB commander routinely approved time-sensitive missions, and SOCFWD-NWA routinely notified SOCAFRICA of these missions within (b)(1) 1.4a of execution.  Over the 11 months prior to 2 October 2017, SFODAs within the SOCFWD-NWA area of responsibility executed (b)(1) 1.4a time-sensitive missions (planned and executed within (b)(1) 1.4a ) for which (b)(1) 1.4a prior notification was required by the SOCAFRICA approval matrix.  SOCAFRICA never denied or objected to any of these missions, and never raised concern over the fact they had not received (b)(1) 1.4a advanced notification.

SECRET//NOFORN

SECRET//NOFORN

(S) SOCAFRICA's lack of guidance or corrective action following any of the previous (b)(1) 1.4a missions, a period spanning the command tenures of both BG Donald Bolduc and Maj Gen Mark Hicks, resulted in the implicit acceptance of short-notice operations.  As a result, SOCFWD-NWA developed a practice of providing immediate notification of time-sensitive CONOPS, then executing the operations even though such notification did not comply with SOCAFRICA's or even SOCFWD-NWA's own (b)(1) 1.4a notification requirement.

(U//FOUO) Lack of Shared Understanding of CONOPS Categorization.

(S)  The SOCAFRICA CONOPS approval matrix established the approval authority for six different categories of missions: (1) (b)(1) 1.4a  (2) (b)(1) 1.4a (b)(1) 1.4a  (3) (b)(1) 1.4a CONOP"; (4) (b)(1) 1.4a CONOP"; (5) (b)(1) 1.4a (b)(1) 1.4a  FRAGO"; and (6) (b)(1) 1.4a CONOP."  The category is determined through a description of the mission and residual risk level associated with that mission.

(S) A review of over 30 CONOPS reveals a lack of clear understanding as to the proper categorization of CONOPS developed by some SFODAs within Niger.  While many CONOPS accurately identify the CONOPS to properly reflect the mission, many conflate (b)(1) 1.4a CONOPS with (b)(1) 1.4a CONOPS. (b)(1) 1.4a CONOPS that would have required SOCCE-LCB approval and subsequent notification to SOCAFRICA (per the SOCAFRICA approval matrix) were routinely approved by the AOB Commander based upon an inaccurate categorization and a belief that (b)(1) 1.4a CONOPS could be approved by the AOB commander.

(S)  (b)(3) / (b)(6)  conducted a total of three operations including the operation on 3-4 October 2017.  Each of these operations had unique tasks and purposes.  The first mission was an area familiarization and key leader engagement and was labeled (b)(1) 1.4a FRAGO, (b)(1) 1.4a (b)(1) 1.4a  The second mission was intended to provide reinforcement to partner forces in (b)(1) 1.4a in response to intelligence suggesting an impending attack.  That CONOPS was labeled (b)(1) 1.4a FRAGO (b)(1) 1.4a , but described by (b)(3) / (b)(6) as a (b)(1) 1.4a CONOPS.  The third mission was intended to find/fix, and if possible capture a high value target, and was labeled (b)(1) 1.4a FRAGO (b)(1) 1.4a Like the prior mission, (b)(3) / (b)(6) considered this to be a (b)(1) 1.4a CONOPS that could be approved by the AOB commander.  (b)(3) / (b)(6) noted in his testimony "I put up a (b)(1) 1.4a CONOP that gets approved by the AOB.  That is how we do missions.  That is the only level of CONOP that I have ever submitted is a (b)(1) 1.4a that gets approved by the AOB."

(U//FOUO) Lack of Shared Understanding of Approval Levels.

(S) As outlined in Annex 1, on 2 October 2017 there were three conflicting CONOPS approval matrices to delineate authorities delegated from the SOCAFRICA commander.  The AOB followed a CONOPS matrix that SOCAFRICA had not approved.  On 3 October 2017, the acting AOB Commander incorrectly believed he had the authority to approve (b)(1) 1.4a and (b)(1) 1.4a CONOPS for Team OUALLAM.

(S) The confusion arose when the SOCFWD-NWA J3 proposed SOCAFRICA's concurrence with a revision to the SOCAFRICA CONOPS approval matrix, then redeployed to Fort Bragg.

SECRET//NOFORN

SECRET//NOFORN

The incoming SOCFWD-NWA J3 erroneously thought that the revised matrix had been approved and implemented it.  Similarly, the AOB Niger commander received a third revised CONOPS Approval matrix from his predecessor that was different than both SOCFWD-NWA's and SOCAFRICA's CONOPS matrices.  Although the investigation was unable to determine where the AOB's version of the CONOPS approval matrix originated, it differed significantly from the matrix implemented by SOCFWD-NWA.  Specifically, the AOB's matrix delegated to the AOB commander approval authority for (b)(1) 1.4a and (b)(1) 1.4a CONOPS, and created a new approval authority for (b)(1) 1.4a FRAGOs.  This discrete category of FRAGOs (b)(1) 1.4a FRAGOs) did not exist on either the SOCAFRICA or the SOCFWD-NWA approval matrices.  The AOB matrix required SOCCE-LCB commander approval for (b)(1) 1.4a FRAGOs.  The AOB matrix also created a (b)(1) 1.4a notification requirement to SOCFWD-NWA that did not exist on either the SOCFWD-NWA matrix or the SOCAFRICA matrix.

(S)  Members of AOB Niger and SOCCE-LCB did not have a common understanding of which authorities had been delegated and which had not even within the context of their contradictory matrices.  The SOCCE-LCB Commander asserted that he had not delegated authority to the AOB Niger Commander to approve (b)(1) 1.4a CONOPS.  Although the commander acknowledged that he could have, he said he was "was not there yet."  Despite this, the AOB operated under the belief that delegation had occurred for (b)(1) 1.4a CONOPS and (b)(1) 1.4a (b)(1) 1.4a FRAGOs.

(U//FOUO)  To add to the confusion, each of the CONOPS used different language to identify the commander to whom approval authority was delegated.  For example, the SOCAFRICA matrix delegated approval authorities to command "levels" (i.e., "may be delegated to the O-5 level").  The SOCAFRICA approval matrix authorized delegation to a specific rank (i.e., "may be delegated to the O-4 CDR").  Finally, the AOB matrix identified the approval authority as the commander of a designated unit without reference to a rank (i.e., "AOB/TU CDR"; and SOCCE-LCB CDR").  Several witnesses articulated different understandings of who could approve an operation that had been delegated, for example, to the "O-4 level."  The SOCAFRICA Commander viewed the delegation to be tied to the rank, while the AOB Niger Commander thought that the authority was tied to the position, and therefore could be delegated to an "acting Commander" even if he was below the rank of O-4.

(U//FOUO) Commanders at all echelons have a duty to ensure approval authorities and operational guidance provided to subordinate commands are clear and unambiguous.  Likewise, in the absence of sufficient implementing guidance, commanders at all echelons owe a duty to seek clarification when directives are unclear or ambiguous.

(U) RECOMMENDATIONS:

(U//FOUO): Recommend Commander, SOCAFRICA establish clear and unambiguous CONOPS approval guidance to all subordinate commanders and require all delegations of authorities to be in writing and filed with their higher headquarters.

SECRET//NOFORN

~~SECRET//NOFORN~~

(~~S~~) Recommend Commander, SOCAFRICA and Commander, SOCFWD-NWA review processes, procedures, and approvals for execution of time-sensitive [ (b)(1) 1.4a ] providing unambiguous guidance to subordinate commands.

## APPOINTING AUTHORITY ACTION

**(U) Finding 4 is approved with comment.**

*(U//~~FOUO~~) COMMENT:* The failures identified in this finding were not the proximate cause of the attack on 4 October 2017. The team's mission at Objective North was coordinated through and approved by the appropriate level of command in accordance with SOCAFRICA's approval framework. Nonetheless, these failures underscore the inherent responsibility commanders have in ensuring clear and unambiguous guidance to subordinate commands. Furthermore, in the absence of clear guidance, commanders at all levels have the responsibility to seek clarification when directives are unclear or ambiguous.

(U) The Mission Command philosophy entails the "exercise of authority and direction by the commander using mission orders to enable disciplined initiative within the commander's intent to empower agile and adaptive leaders in the conduct of unified land operations."[1] This philosophy is guided by the principles of:

- (U) Build cohesive teams through mutual trust
- (U) Create shared understanding
- (U) Provide a clear commander's intent
- (U) Exercise disciplined initiative
- (U) Use mission orders
- (U) Accept prudent risk

(U) The proper application of the philosophy and its guiding principles requires clear guidance from higher headquarters. It requires communication that is both top-down and bottom-up. It demands subordinate commanders provide accurate information to higher headquarters in order to create shared understanding.

(U//~~FOUO~~) Since October 2017, Commander SOCAFRICA has recognized, and taken affirmative steps to remediate, the confusion of concept of operations approval authorities noted in this report and to provide clear guidance and intent to subordinate commanders. These steps include making appropriate decisions at the lower levels of the chain of command while elevating approval levels for specific operations in order to provide higher headquarters more input and an ability to analyze from a wider perspective. This will also support the Mission Command concept by mandating and enforcing notification requirements to ensure operations meet Commander SOCAFRICA's intent and are properly resourced.

---

[1] Army Doctrine Reference Publication 6-0, Mission Command

~~SECRET//NOFORN~~

SECRET//NOFORN

## FINDING 5

(U//FOUO)  **INVESTIGATION FINDING 5**:  Team OUALLAM was not equipped with a vehicle set that would afford them the operational flexibility to adjust equipment based upon changes to the battlefield.

(U) DISCUSSION:

(U//FOUO) Team OUALLAM was equipped with seven vehicles:  three sport utility vehicles (SUVs) and four pickup trucks.  Some of those vehicles were used for administrative and logistical needs, while others were used for tactical patrols.  On 3 October 2017, Team OUALLAM used three vehicles:  two Toyota Land Cruiser four-door pickup trucks and a Toyota SUV.  The team used the SUV as a make-shift ambulance.

(S) Team OUALLAM's vehicles were 4-wheel drive,                (b)(1) 1.4g

(b)(1) 1.4g

(b)(1) 1.4g

(S) Team OUALLAM's vehicles were unarmored (light-skinned) vehicles.        (b)(1) 1.4g

(b)(1) 1.4g

(b)(1) 1.4g

The partner force vehicles would mount their        (b)(1) 1.4g        on their trucks, although during the 3 – 4 October 2017 mission they had neither weapon system with them.

(S) Other SFODAs in Niger had different vehicles than Team OUALLAM had based upon the enemy situation, terrain, and weather in their areas.        (b)(1) 1.4g

(b)(1) 1.4g

(b)(1) 1.4g

(U//FOUO) RECOMMENDATION:  Recommend USSOCOM and SOCAFRICA conduct a holistic review of vehicle requirements in theater based on mobility, protection, and weapon utilization. Consider implementation of a theater motor pool concept that will allow commanders the flexibility to choose vehicles based on mission requirements, changing terrain/climatological conditions, threat assessments, and partner force capabilities.

## APPOINTING AUTHORITY ACTION

(U) **Finding 5 is approved with comment.**

(S) *COMMENT*:  Force mobility requirements warrant constant scrutiny and review. USSOCOM and SOCAFRICA must provide the operating forces the choice of heavy and light

SECRET//NOFORN

SECRET//NOFORN

vehicles as determined by factors such as speed, mobility, protection, weather conditions, and trafficability.  USSOCOM and SOCAFRICA have acknowledged this requirement and have taken steps to ensure the SFODAs have a range of vehicles from which they can choose based on their operational needs.  With USSOCOM support, SOCAFRICA has begun to move (b)(1) 1.4a (b)(1) 1.4a vehicles into Niger.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 6**

**(U//FOUO) INVESTIGATION FINDING 6:** Prior to 4 October 2017, approximately half of Team OUALLAM had never conducted a collective training event with the team.

(U) DISCUSSION.

(U//FOUO) As outlined in Part II of this report, higher echelon training guidance was published in a timely manner and properly nested from USSOCOM to USASOC through 1st SFG(A) to 3d SFG(A).  3d SFG(A) FY17 Command Training Guidance (CTG) was published in 24 July 2016 and included the following provisions for the Battalions: ensure that all deploying units and attachments are incorporated into PMT; take responsibility for planning, resourcing, and executing a PMT CULEX; include mobility, sustainability, and recoverability in PMT; and incorporate academics on SOF programs, fiscal/operational authorities, and other mission critical subjects prior to deployment.  The CTG required Battalion Commanders to certify and validate SFODAs annually and prior to every deployment.

(S) Special Warfare Center and School (SWCS) levies and summer rotations cause personnel turnover for (b)(1) 1.4a deployments.  Although (b)(3) / (b)(6) pre-deployment training complied with the 3d SFG(A) training guidance, it failed to take into account the composition of the team during the pre-deployment collective training events.  Only six of 11 team members participated in the JADE HELM exercise together.  The Battalion considered JADE HELM to be the validation exercise required by 3d SFG(A) training guidance, although participating SFODAs do not appear to have been externally evaluated.  Three of the team's key leaders, the Commander, the Warrant Officer, and the Team Intelligence Sergeant left the team in June and August, after JADE HELM.  The new Commander, (b)(3) / (b)(6) arrived in June along with (b)(3) / (b)(6)  The two participated in JADE HELM, but not with (b)(3) / (b)(6)  (b)(3) / (b)(6) and SSG Jeremiah Johnson arrived to the team in mid-September after they had already deployed to Niger. (b)(6) (b)(6) joined the team temporarily only days before the events of 4 October 2017.  The turnover of the team along with late additions rendered key parts of the team's pre-deployment collective training ineffective.  To compound the problem, the team failed to conduct battle drills or rehearsals when new personnel arrived.

(U//FOUO) In addition to personnel turnover, a number of individual training events and administrative events precluded the team from conducting pre-deployment collective training with all personnel present.

(U//FOUO) 2/3 SFG(A) conducted semi-annual training briefs (SATB) in October 2016, March 2017, and July 2017.  In those briefings, (b)(3) / (b)(6) 2/3 SFG(A) Commander outlined training that the SFODAs had completed and planned to conduct in future quarters.  Additionally, the SFODA Commander reported to the 2/3 SFG(A) Commander the training status of the Company in certain Mission Essential Tasks.  The SATB failed to take into account personnel turnover and attendance at each scheduled training event when it assessed the units' training status. (b)(3) / (b)(6) (b)(3) / (b)(6) 2/3 SFG(A) Commander who gave the last SATB to the 2/3 SFG(A) Commander before deployment had just taken command that month.  Neither the (b)(3) / (b)(6) nor the (b)(3) / (b)(6)

SECRET//NOFORN

SECRET//NOFORN

(b)(3) / (b)(6) Commanders had participated in any validation exercises with their units or conducted any collective training prior to deployment

(U) RECOMMENDATIONS:

(U//FOUO) Recommend the Commander, USSOCOM reassess Pre-mission Training Requirements and consider adjustments to manning priorities to ensure SFODAs and their enablers are locked in for the months leading up to deployment in order to enable requisite collective training as a deployable unit.

(U//FOUO) Recommend battalion commanders amend their SATB to take personnel turnover and training attendance into account when assessing SFODA training status and deployment readiness IAW FM 7-0, paragraph 1-14.

(U//FOUO) Implement operational stand-downs when SFODAs initially deploy to an African country if they were unable to meet their pre-deployment training requirements so that key collective tasks are completed prior to operations being conducted.

## APPOINTING AUTHORITY ACTION

**(U) Finding 6 is approved as modified with comment.**

*(U//FOUO) ADDITIONAL COMMENT AND RECOMMENDATION:*  Sourcing of units in a timely manner preparing to deploy overseas continues to be a challenge.  A unit can have the best training plan, but will encounter difficulties if it does not have the proper personnel sourcing solution to execute the pre-deployment training.  In this case, personnel turbulence in the form of turn-over, including key leadership positions towards the end of the pre-deployment training cycle, resulted in (b)(3) / (b)(6) not completing the majority of pre-deployment training as a complete team.

(U//FOUO) Recommend USSOCOM and subordinate units review personnel assignment policies to ensure personnel, especially those in leadership positions, are in place early enough in the operational cycle to complete all pre-deployment training requirements and build cohesive teams in accordance with the tenants of the Mission Command philosophy.  If the personnel situation is stabilized, units can then take advantage of well devised training plans and gain the trust and confidence that comes from team cohesion.

(U//FOUO) In this case, changes in team leadership took place deep into the training cycle and detracted from the overall unit cohesion of (b)(3) / (b)(6)  If progress can be made in having team members in place as training begins, then other concerns, such as collective training, will be rectified.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 7**

**(U//FOUO) INVESTIGATION FINDING 7**: A perception of inflexible institutional policies and procedures resulted in a Relief in Place and Transfer of Authority (RIP/TOA) between [(b)(3) / (b)(6)] and [(b)(3) / (b)(6)] that was rushed and inadequate.

(U) DISCUSSION:

(U//FOUO) As discussed in detail in Part III of this report, [(b)(3) / (b)(6)] and [(b)(3) / (b)(6)] did not conduct a traditional left seat/right seat, conditions-based RIP/TOA. In light of the USSOCOM 200-day "door to door" dwell-to-deployment policy, 3d SFG(A) planned short RIP/TOA periods under the assumption that regionally aligned SFODAs in constant contact with their counterparts in-country via email did not require overlapping RIP/TOA processes. AOB Commanders operated under the perception that RIP/TOA timelines could not be modified or extended to accommodate longer RIP/TOAs and they believed that the procedures they had in place were adequate.

(U//FOUO) Key to the RIP/TOA process is the ability of the incoming team to immediately assume the mission of the outgoing team. In this case neither the main body of the incoming team nor their equipment were in place at the moment the transfer of authority occurred. The result was that [(b)(3) / (b)(6)] never rehearsed base defense with [(b)(3) / (b)(6)] never conducted battle drills with either [(b)(3) / (b)(6)] or their partner force to baseline tactical SOPs, and never conducted area familiarization or key leader engagements with [(b)(3) / (b)(6)] When [(b)(3) / (b)(6)] [(b)(3) / (b)(6)] conducted their first operation from Ouallam, only one member of the SFODA had ever been on a patrol in that area: [(b)(3) / (b)(6)]

(U//FOUO) The fact that [(b)(3) / (b)(6)] and [(b)(3) / (b)(6)] were "regionally aligned" and connected by email to [(b)(3) / (b)(6)] did not obviate the need for on-the-ground, face-to-face, area and partner force orientation. In the year between [(b)(3) / (b)(6)] deployments to Niger, the partner force changed, the enemy changed, the area of responsibility changed, and their base of operations changed. The only thing that remained the same for them was the country.

(U//FOUO) Joint Terminal Attack Controller (JTAC) deployments did not coincide with SFODA deployments and JTAC coverage was gapped on 4 October 2017, leaving [(b)(3) / (b)(6)] without a JTAC.

(U) RECOMMENDATIONS:

(U//FOUO) Recommend SOCAFRICA and SOCFWD-NWA commanders revise RIP/TOA timelines to ensure a conditions-based RIP/TOA with sufficient overlap between teams and their equipment vice a time/transportation-based RIP/TOA.

(U//FOUO) Recommend SOCAFRICA and SOCFWD-NWA develop and enforce a RIP/TOA methodology tailored to each operational environment that includes a comprehensive RIP/TOA checklist that will enable the incoming element to fully understand the enemy situation, the

SECRET//NOFORN

SECRET//NOFORN

environment, and friendly force capabilities and training.

(U//FOUO) When key RIP/TOA tasks like partner force training and rehearsals cannot be accomplished prior to TOA, recommend AOB Commanders impose operational stand-downs on SFODAs until those tasks are completed to standard.

(U//FOUO) Recommend SOCAFRICA and SOCFWD-NWA commanders synchronize operational and enabler support RIP/TOA timelines to ensure uninterrupted coverage and support.

## APPOINTING AUTHORITY ACTION

**(U) Finding 7 is approved as modified with comment.**

*(U//FOUO) MODIFIED FINDING:* A perception of inflexible institutional policies and procedures resulted in a compressed Relief in Place and Transfer of Authority (RIP/TOA) between ⟨(b)(3) / (b)(6)⟩ and ⟨(b)(3) / (b)(6)⟩ I find the formal transition of authority between ⟨(b)(3) / (b)(6)⟩ and ⟨(b)(3) / (b)(6)⟩ although compressed, to have been adequate given the constant communications between the teams in the months leading up to the transition. However, there was insufficient tactical turnover between ⟨(b)(3) / (b)(6)⟩ and ⟨(b)(3) / (b)(6)⟩ in relation to their partner force prior to ⟨(b)(3) / (b)(6)⟩ conducting operations with their partner force.

*(U//FOUO) COMMENT*: The Special Operations community starts its RIP/TOA well in advance of the actual relief in place. As designed, these forces rotate in and out of the theater and there is constant communications between SFODAs at home station and those forward deployed throughout the pre-deployment training cycles. This pre-deployment coordination is a positive aspect of the team turnover procedure. In this case, the actual RIP/TOA was compressed. Therefore, the recommendations to this finding are approved and forwarded for appropriate action.

(U//FOUO) Even though the RIP/TOA process was compressed, the previous months of communication between teams allowed for a general appreciation for the partner force and the team's area of operations. However, during and after the RIP/TOA, the new SFODA must conduct a thorough assessment of partner force capabilities. This assessment goes beyond basic shoot and move tactics, techniques, and procedures, and should include an understanding, coupled with rehearsals, of battle drills such as responding to enemy contact. This level of tactical turnover activity did not take place prior to the 4 October 2017 ambush, and will be addressed fully in Finding 8. The SFODA must gain a level of familiarity and trust in the military competence of their partner force prior to commencing partnered operations. Leaders at the battalion and group level must supervise this process.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 8**

(U//~~FOUO~~) **INVESTIGATION FINDING 8**: The [(b)(3) / (b)(6)] Team Leader and Team Sergeant failed to conduct battle drill and pre-mission rehearsals prior to executing operations on 3-4 October 2017.

(U) DISCUSSION:

(U//~~FOUO~~) [(b)(3) / (b)(6)] relied primarily on the training that [(b)(3) / (b)(6)] had conducted with [(b)(3) 130b] before their arrival in Ouallam. Before [(b)(3) / (b)(6)] arrived in Niger, [(b)(3) / (b)(6)] conducted Joint Combined Exchange Training (JCET) with [(b)(3) 130b] in Tahoua, and then brought them to Ouallam when they moved in June 2017. [(b)(3) / (b)(6)] used the Ranger handbook as their textbook for training [(b)(3) 130b] on small unit tactics and battle drills. They also conducted interoperability training and involved [(b)(3) 130b] in their pre-mission rehearsals and weapons checks prior to missions.

(U//~~FOUO~~) Although [(b)(3) / (b)(6)] conducted two previous missions with their Nigerien partners, they never conducted collective training or pre-mission rehearsals that covered convoy operations, battle drills, or other enemy contact drills. Team OUALLAM would talk through TTPs and SOPs with [(b)(3) 130b] leadership, but they relied upon the training previously provided to [(b)(3) 130b] by [(b)(3) / (b)(6)]

(U//~~FOUO~~) To complicate the combined element's response to enemy contact, members of Team OUALLAM's partner force spoke a variety of languages including French, Hausa, and Zarma. The Team Sergeant was fluent in French. The other Team members had a cursory survival-level knowledge of French, Hausa, and Zarma. They relied primarily on interpreters to communicate with the Partner Force. When the attack on 4 October 2017 happened, the one interpreter they had, who was unarmed and had no protective equipment, immediately fled and sought cover.

(~~S~~) The initial reaction to contact by Team OUALLAM and their Partner Force was incoherent and disjointed [(b)(1) 1.4g] [(b)(1) 1.4g] The reaction was also confused because there was not a well drilled and common understanding of what actions each element would take on contact. Similarly, when the Team Leader made the decision to break contact with the enemy, there was no rehearsed signal or planned order of movement to initiate and execute the break contact maneuver. The language barrier further complicated matters because Team OUALLAM had no way to effectively communicate what they wanted their partners to do. That problem could have been mitigated with battle drills and rehearsals.

(U//~~FOUO~~) Finally, several of the Partner Force witnesses testified that their weapons malfunctioned and were useless for most of the fight. There is no evidence to indicate that the Partner Force test-fired their weapons prior to commencement of the mission, which might have identified deficiencies that could have been resolved before they left Ouallam.

SECRET//NOFORN

SECRET//NOFORN

(U) RECOMMENDATIONS:

(U//FOUO) Recommend SOCAFRICA and SOCFWD-NWA commanders include partner collective training in the RIP/TOA, incorporate pre-mission battle drill rehearsals as risk mitigation measures, and require battle drill rehearsals and test fire prior to the conduct of any operation.

(U//FOUO) Recommend this finding be forwarded to the Commander, USSOCOM for other action as he deems appropriate.

## APPOINTING AUTHORITY ACTION

**(U) Finding 8 is approved with comment.**

*(U//FOUO) COMMENT:* Prior to departing on this mission, [(b)(3) / (b)(6)] did not conduct collective training or pre-mission rehearsals that covered convoy operations, battle drills, or other actions upon enemy contact. Pre-mission rehearsals and battle drills are fundamental to all combat operations, but are even more critical when U.S. forces conduct partnered operations that are further complicated by language barriers and a limited amount of prior combined experience. In this case, this was [(b)(3) / (b)(6)] third patrol since arriving in country with a partnered force few of whom spoke English. The team departed on the mission, augmented by additional partner Nigeriens who joined the force that morning, without conducting any meaningful rehearsals.

(U//FOUO) The investigation determined the immediate response to contact by U.S. and partnered forces was disjointed and chaotic. The lack of a coordinated and synchronized response to contact was to a large degree a result of no meaningful pre-mission rehearsals. Pre-mission rehearsals and immediate action drills with the partner force is a fundamental aspect of "good soldiering." The deficiency must be immediately addressed by the chain of command.

(U) I concur with the Investigating Officer's recommendations and recommend Commander USSOCOM take action as he deems appropriate.

SECRET//NOFORN

SECRET//NOFORN

### FINDING 9

**(U//FOUO)  INVESTIGATION FINDING 9**:  The Team OUALLAM commander and AOB Niger acting commander failed to identify and implement adequate mitigation measures sufficient to reduce the residual risk to LOW during the planning process of their initial mission.

(U) DISCUSSION.  This finding is thoroughly discussed in Annex 7.

(U//FOUO) RECOMMENDATION. Recommend the SOCAFRICA commander conduct a holistic review and revision of their risk assessment and mitigation methodology.

### APPOINTING AUTHORITY ACTION

**(U) Finding 9 is approved as modified with comment.**

*(U//FOUO) MODIFIED RECOMMENDATION:*  Recommend the SOCAFRICA commander conduct a holistic review and revision of their risk assessment and mitigation methodology to include the unit and partner force's training.

*(U//FOUO) COMMENT:*  Training and oversight on risk mitigation is imperative, especially in the resource constrained operating environments of Africa.  This includes developing realistic risk assessments that factor posture and minimum force requirements.  Leaders must understand when they do not have the resources required to conduct a mission, or the risk increases because of resource constraints, then they must request those resources or consider not undertaking the mission.  This is an area where communication with higher headquarters can lead to more measured perspective and the consideration of other options in pursuit of mission accomplishment.

(U//FOUO) For example, the concept of operations for [ (b)(3) / (b)(6) ] initial mission to Tiloa made no mention of a high valued target or the use of partner forces to fix the location of this target.  Consequently, the mischaracterized CONOPs failed to adequately identify and mitigate risks to force associated with the true purpose of the mission.  The mischaracterization of the CONOPs also prevented higher levels of command from providing the measured perspective that would have been afforded to the CONOPs had the mission been accurately characterized.

(U) Mission Command suggests commanders accept prudent risk, which dictates avoiding inadequate planning and preparation.  Further, risk mitigation under Mission Command encourages collaboration and dialogue with subordinates.  Dialogue on planning and risk mitigation requires accurate information and should include pushing information to higher headquarters so the senior commander can provide proper oversight and assistance.

(U//FOUO) SOCAFRICA has begun to develop an Operational Management Quick Guide to assist tactical leaders in addressing operational risks, to include accounting for any lack of capability of the partner force.  The intention is to provide clear guidance to ensure the chain of command can and will provide oversight on CONOPs as part of the risk mitigation process.

SECRET//NOFORN

SECRET//NOFORN

## FINDING 10

(U//~~FOUO~~) **INVESTIGATION FINDING 10**:  The acting AOB Niger commander failed to coordinate for emergency CASEVAC and personnel recovery support with French and Nigerien partner forces prior to operations, even though they were identified in the CONOPS "PACE" (Primary, Alternate, Contingency, Emergency) plan.

(U) DISCUSSION:

(~~S~~) Team OUALLAM's [ (b)(1) 1.4a ] CONOPS and Team ARLIT's [(b)(1) 1.4a] FRAGO on 3 October 2017 each listed French assets from [ (b)(1) 1.4a ] as part of their air evacuation PACE plan.  Both CONOPS also listed Nigerien forces in their PR plans.  Despite identifying these forces as medical and personnel recovery assets, [ (b)(1)1.4(a) ] French or Nigerien forces or integrate them into planning to ensure their availability if needed.

(~~S~~) Team OUALLAM and AOB Niger did not conduct pre-mission coordination with French forces for [ (b)(1) 1.4a ] Team OUALLAM was under the impression that [ (b)(1) 1.4ag ] and therefore they did not conduct [ (b)(1) 1.4a ] or include [ (b)(1) 1.4a ] assets in their mission planning process.

(~~S~~) The U.S. LNOs working with French Task Forces BARKHANE and [(b)(1) 1.4a] demonstrated the importance of integration with our Allies while conducting operations.  Their ability to communicate with the French based on an established relationship provided Team OUALLAM with the necessary support from French Air Forces that ultimately saved lives.  However, [(b)(1) 1.4g] [ (b)(1) 1.4g ] their support on 4 October 2017 was limited to shows of force.

(U) RECOMMENDATIONS:

(U//~~FOUO~~) Recommend SOCAFRICA implement procedures to ensure sufficient pre-coordination with partner nation units when they are listed on the CONOPS as potential support assets.

(~~S~~) Recommend USAFRICOM establish and maintain formal agreements [ (b)(1) 1.4g ] [ (b)(1) 1.4g ]

(U//~~FOUO~~) Recommend this finding be forwarded to the Commander, USSOCOM for other action as he deems appropriate.

## APPOINTING AUTHORITY ACTION

(U) **Finding 10 is approved with comment.**

*(U//FOUO) COMMENT:*  Detailed planning with partner forces not co-located with U.S. forces and who are expected to provide emergency support must involve higher headquarters coordination to provide situational awareness, and to ensure information given to U.S. liaison officers is updated and properly vetted with the partner forces providing the response.  The recommendation for

SECRET//NOFORN

SECRET//NOFORN

SOCAFRICA to "implement procedures to ensure sufficient pre-coordination with partner nation units when they are listed on the CONOPs as potential support assets" is critical. The information must be accurate in order to depend on those forces when our forces encounter unexpected difficulties on the battlefield. On 4 October 2017, French and Nigerien forces were available to assist, however they were unaware of details regarding Team Ouallam's mission. Despite the lack of coordination, the partner forces responded. This type of quick response cannot be left to chance. The use of partner forces as CASEVAC or PR contingencies must be coordinated in detail just as any other part of the tactical plan.

(U//FOUO) Partner forces must be aware of what taskings they are expected to perform, so they can plan for requested support, respond if needed, or inform our units if they cannot provide the requested support. This requires planning and coordination through liaison officers, with SOCAFRICA and its subordinate regional SOCFWD headquarters elements providing oversight. This prior coordination is essential, as the availability of partner forces for support must be a factor in the risk assessment and mitigation methodology.

(U//FOUO) As indicated in the finding, Team OUALLAM's higer headquarters did not adequately conduct this coordination.

(U//FOUO) I recommend this finding be forwarded to the Commander, USSOCOM for appropriate action.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 11**

(U//FOUO) **INVESTIGATION FINDING 11:** Air Forces Africa's (AFAF) ISR and PR response was hindered by limited operational planning and procedures, and a lack of coordination and synchronization with U.S. forces and partner nations.

(U) DISCUSSION:



(S) (b)(S) 1.4a, (b)(1) crews re-tasked from (b)(1) 1.4a, (b)( operations (b)(1) 1.4a, (b)(1) 1.4g were unfamiliar with operations in Niger and did not have access to mission CONOPS, a SITREP, or Commander's Intent in order to gain situational awareness (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g Team OUALLAM commander's tactical decision to divert (b)(1) 1.4a, (b)(1) 1.4g to follow suspected enemy personnel from Objective NORTH resulted in (b)(1) 1.4a, (b)(1) 1.4g coverage as the Team returned to base through Tongo Tongo. (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g

(S) (b)(S) 1.4a, (b)(1) crews had not previously interacted with French forces, either tactical air assets like the Mirage fighters or ISR assets (b)(1) 1.4a, (b)(1) 1.4d   A familiarity with French capabilities and an understanding of communications procedures (reinforced through exercises) would have significantly enhanced U.S.-French ISR support or possible (b)(1) 1.4a, (b)(1)1.4d on 4 October 2017.

(S) The USAFRICOM SPINS provide supplemental information for PR planning to include (b)(1) 1.4a, (b)(1) 1.4d (b)(1) 1.4a, (b)(1) 1.4d (b)(1) 1.4a, (b)(1) 1.4d The SPINS are meant to be distributed to all affected agencies to ensure a basic level of understanding between all participants in any PR event. (b)(1) 1.4a, (b)(1) 1.4d (b)(1) 1.4a, (b)(1) 1.4d After the attack there was difficulty coordinating actions between French, Nigerien, and U.S. forces in the area

(b)(1) 1.4a, (b)(1) 1.4d

(b)(1) 1.4a, (b)(1) 1.4d

(U//FOUO) RECOMMENDATION:  Recommend Commander Air Forces Africa and Commander SOCAFRICA review processes for coordination and synchronization between ground forces, partner forces, and ISR assets.

SECRET//NOFORN

SECRET//NOFORN

## APPOINTING AUTHORITY ACTION

**(U) Finding 11 is approved with no additional comment.**

SECRET//NOFORN

SECRET//NOFORN

**FINDING 12**

(U//~~FOUO~~) **INVESTIGATION FINDING 12**:  The Team OUALLAM Commander, the acting AOB Niger Commander, the AOB Niger Operations Warrant Officer and Sergeant Major failed to accurately characterize the mission that Team OUALLAM conducted in Tiloa to the SOCCE-LCB Commander.  The mischaracterization was a result of complacency and an over-reliance on templated CONOPS.

(U) DISCUSSION.

(S) As discussed in greater detail in Part IV(1)(d.) of this report, the [(b)(3) / (b)(6)] Team Leader and the acting AOB Commander and his staff knew that the intended purpose of the original mission on 3 October 2017 was to act on time-sensitive intelligence in order to find/fix the location of [(b)(1) 1.4a]

(S) The [(b)(3) / (b)(6)] Team Leader developed a CONOPS that described the mission as a "civil / military reconnaissance."  The CONOPS inaccurately described the purpose of the mission to "improve situational awareness of th[(b)(1)1.4a] region and effectiveness of current military efforts to disrupt AQIM/ISIS-GS activity in the area."  As prepared, the CONOPS outlined a series of key leader engagements (KLE) in various locations that Team OUALLAM never intended to actually visit.  The CONOPS made absolutely no mention of [(b)(1) 1.4a] [(b)(1) 1.4a] [(b)(1) 1.4a]

(S) Despite providing the intelligence that drove this mission, and active participation in developing the CONOPS, including allocating ISR assets to assist in fixing the location of [(b)(1) 1.4a] the acting AOB Commander and his staff reviewed and approved the CONOPS as developed by the [(b)(3) / (b)(6)] Team Leader.  The acting AOB Commander thereafter notified the SOCCE-LCB Commander of the mission as described in the CONOPS, but failed to inform the SOCCE-LCB Commander that the mission actually intended to find/fix the location of a named objective.  The SOCCE-LCB Commander was never aware of the true nature of the original mission to Tiloa.

(S) Had the original CONOPS been characterized accurately, it would have required a higher approval-authority and [(b)(1) 1.4a] notification to SOCAFRICA.  The nature of the mission would have generated additional scrutiny, coordination, and supervision from levels of command higher than the AOB.

(U//~~FOUO~~) A preponderance of the evidence does not support a finding that the mischaracterization was intended, but rather a result of the negligent use of templated CONOPS.

(U//~~FOUO~~) Commanders at all levels owe a duty of care in accurately characterizing the nature of their mission in order to ensure their CONOPS receive the required degree of scrutiny and coordination.

SECRET//NOFORN

SECRET//NOFORN

(U//FOUO) RECOMMENDATION: Recommend this finding be forwarded to the Commander, USSOCOM for action as he deems appropriate.

## APPOINTING AUTHORITY ACTION

**(U) Finding 12 is approved with comment.**

*(U//FOUO) COMMENT:* Confusion in the CONOPs approval process along with the mischaracterization of the original mission for ⬚(b)(3) / (b)(6)⬚ resulted in the higher headquarters not knowing the true intent of the mission to Tiloa. It is clear the battalion level commander at the SOCCE was unaware of the true nature of the original mission until long after the event. Had the team and company-level commander accurately characterized the first mission, it would have resulted in increased oversight at higher levels of command. However, additional supervision and focus on operations from the highest levels could have increased the chances that the SFODA and AOB would have accurately characterized their CONOPs.

(U//FOUO) This finding underscores the importance of trust and clear top-down and bottom-up communication in the Mission Command framework. Mission Command is underpinned by mutual trust higher to lower and lower to higher. Commanders must communicate clear and unambiguous guidance to subordinate commands with the implicit trust the guidance will be followed. At the same time, the subordinate commander must trust senior commanders and push timely and accurate information up the chain of command. A senior commander cannot properly exercise oversight and supervision if his subordinates are mischaracterizing, or withholding critical information.

(S) ⬚(b)(1) 1.4a⬚ was a central figure in the planning of the original mission to Tiloa. The fact that the battalion level commander was unaware reflects a lack of appreciation at the company level for the criticality of trust and clear bottom-up communication. Consequently, I concur with the recommendation to forward this finding to the Commander, USSOCOM for action as he deems appropriate.

SECRET//NOFORN

~~SECRET//NOFORN~~

## FINDING 13

(U//~~FOUO~~)  **INVESTIGATION FINDING 13**:  Reports that the Tongo Tongo village elder intentionally stalled Team OUALLAM and their Nigerien partners to give the enemy time to attack are not supported by a preponderance of the evidence.

DISCUSSION:

(U//~~FOUO~~) While there is some evidence to indicate that the enemy enjoys freedom of movement in Tongo Tongo, there is not enough evidence to conclude that the villagers of Tongo Tongo willingly (without duress) aid and support them.

(U//~~FOUO~~) ISR video footage following the attack on 4 October 2017 shows large groups of fighting-age males assembling near the southeastern corner of the village before dispersing into the village.  When questioned, villagers including the village elder acknowledge that they have regular contact with the perpetrators of the attack, but that perpetrators are not from the village and any aid or silence the villagers provide is under threat of being killed.

(U//~~FOUO~~)  During the attack, the village elder called the regional prefect for Tongo Tongo and reported that U.S. and Nigerien forces were under attack.  After the attack, the same village elder aided Nigerien forces in finding wounded and dead U.S. and Nigerien personnel in the area surrounding the village.  [(b)(6)] also aided Nigerien and U.S. forces in finding the bodies of SSG Wright, SSG Black, and SSG Jeremiah Johnson.

RECOMMENDATION:  (U//~~FOUO~~) None.

## APPOINTING AUTHORITY ACTION

**(U) Finding 13 is approved with no additional comment.**

~~SECRET//NOFORN~~

SECRET//NOFORN

**FINDING 14**

(U//FOUO) **INVESTIGATION FINDING 14:**  SSG Justin Wright, SSG Bryan Black, SSG Jeremiah Johnson, and SGT LaDavid Johnson died actively engaging the enemy and were not captured and executed.  The enemy stripped their bodies of serviceable equipment and they were found partially clothed.

(U) Discussion.

(U) SSG Wright, SSG Black and SSG J. Johnson.

(U//FOUO) As noted in Part IV, paragraph 5 above, witnesses last saw SSG Wright, SSG Black, and SSG Jeremiah Johnson in the original TIC site, fighting from the cover of USV2.  Until January 2018, the investigating team based its findings of fact with regard to the deaths of SSG Wright, SSG Black, and SSG J. Johnson largely on circumstantial evidence as corroborated by physical evidence collected from the scene of the attack.  On 25 January 2018, ISIS-GS published a propaganda video that included video footage from a helmet camera that SSG J. Johnson was wearing during the attack and up until the moment he died.  Although the video is spliced and edited in places, its content and authenticity are corroborated by a substantial amount of physical evidence collected by the investigating team at the site of the attack.

(U) Based upon a preponderance of the evidence:

(U//FOUO) SSG Bryan Black died instantly from a gunshot wound ⬜ while actively engaging the enemy in an attempt to withdraw from the initial TIC site.  He was the first U.S. service member to die in the attack.

(U//FOUO) The enemy critically wounded SSG J. Johnson, immobilizing him, as he and SSG Wright attempted to break contact and evade to the west of the initial TIC site.  SSG Wright came back to SSG J. Johnson's position after he was wounded and attempted to repel the advancing enemy.  The enemy killed both Soldiers with small arms fire approximately 85 meters west of USV2 in the vicinity of the initial TIC site.

(U//FOUO) As the enemy assaulted through the TIC site, they fired bursts into the bodies of all three Soldiers.  They ultimately stripped the three bodies of any serviceable equipment and uniform items and later attempted to remove them from the battlefield in a pick-up truck.

(U//FOUO) Nigerien villagers from Tongo Tongo found the three bodies, later recovered by Nigerien armed forces, at the original TIC site.  Nigerien forces turned the remains of SSG Black, SSG Wright, and SSG J. Johnson over to U.S. Forces near the TIC site on the evening of 4 October 2017 for dignified transfer.

(U) SGT LaDavid Johnson.

(U//FOUO) The investigating team photographed and collected five expended 5.56mm shell casings and a single unexpended 5.56mm round from the tree where SGT Johnson's remains

SECRET//NOFORN

SECRET//NOFORN

were discovered.  The investigating team found four of those casings and the unexpended round outside of the tree to the immediate east of the tree.  One expended casing was found inside the perimeter of the tree, close to where SGT Johnson's body was discovered.  Forensic scientists identified SGT Johnson's DNA on physical evidence collected from the site including 5.56 casings and a radio antenna.  The position of the shell casings relative to the tree indicate SGT Johnson fired his U.S. M4 weapon a total of five times on advancing enemy before being killed.

(U//FOUO) The team found 42 expended DShK shell casings near tire tracks approximately 95m from SGT Johnson's last fighting position under the tree.  Investigators photographed the tree and it appeared to have been hit several times by large-caliber fire.

(U//FOUO) Investigators found 7.62 x 39mm (AK-47) shell casings and projectiles in incremental positions between the DShK rounds and the tree.  The presence of those casings suggest the enemy suppressed SGT Johnson from a DShK-mounted vehicle from a distance of 95m before dismounted enemy advanced on his position with AK-47s.

(U//FOUO) Various print and television news outlets published reports stating that SGT Johnson's hands were bound before the enemy executed him.  Those reports are false.  Those articles quote an "anonymous Nigerien soldier" and a "23-year old villager from Tongo Tongo named Adamou Boubacar."  A Washington Post article quotes "Adamou Boubacar, a 23 year-old farmer and trader" as its source.  Adamou Boubacar, however, is a (b)(6) year-old elder from the village of Tongo Tongo.  The investigating team interviewed him in person.  In a recorded interview, Adamou Boubacar disputed the account attributed to him in the Washington Post.  Journalist Debora Patta also interviewed Adamou Boubacar in a televised CBS news story and he said nothing about seeing SGT Johnson's remains.

(U//FOUO)  The investigating team made every effort to identify and locate the "anonymous Nigerien soldier" quoted in the CBS news piece cited above.  CBS News declined the investigating team's request for the witness's contact information.  The investigating team interviewed [ (b)(6) ] the village elder who first reported the discovery of SGT Johnson's remains.  In a recorded interview, the elder described SGT Johnson's body positioned in the same manner as it was observed and photographed by the FAN forces who recovered his remains.  The investigating team also interviewed the commander of the FAN forces who were first to arrive at the scene where SGT Johnson's remains were discovered.  That commander personally viewed and photographed SGT Johnson's remains at the site, and he disputed the account of the "anonymous Nigerien soldier" and the description in the Washington Post article.  The commander also stated no member of his organization spoke with any news outlet.  Furthermore, ISR full motion video shows numerous FAN soldiers as they discover SGT Johnson's remains, inspect the area, remove him from under the tree, wrap his remains, and place him into a vehicle.  None of those Soldiers corroborated the account by the "anonymous Nigerien soldier."

(U//FOUO) No medical forensic evidence exists to suggest that SGT Johnson's wrists or arms were bound.  No ligature marks were apparent at the time of the autopsy.  The autopsy report notes the absence of soot or unburned gunpowder particles that would indicate the close range discharge of a firearm.  Shell casings and [ (b)(6) ] discovered in the ground beneath

SECRET//NOFORN

SECRET//NOFORN

where SGT Johnson's head was positioned indicate SGT Johnson was shot there and not subsequently carried or moved into that position.  When the village elder discovered his remains, SGT Johnson was ⬛⬛⬛⬛⬛(b)(6)⬛⬛⬛⬛⬛ That was the same position in which he was found and photographed by the FAN commander on the scene.

(U//FOUO) These findings also consider the investigating team's common understanding of enemy tactics and methods.  It is unlikely the enemy would have suppressed SGT Johnson with heavy DShK machine gun fire except for SGT Johnson engaging the enemy from his position of concealment.  SGT Johnson's helmet had three bullet holes through it.  If captured alive, it is unlikely the enemy would have shot SGT Johnson through a protective helmet.  The investigating team further believes if SGT Johnson were captured alive, the enemy would have attempted to keep him hostage for potential propaganda use.  The tree under which villagers and FAN personnel discovered SGT Johnson's body was an extremely thorny tree in an otherwise sparsely vegetated field.  The tree had thick thorny branches that hung low to the ground.  The tree would have been difficult to crawl under, other than in an attempt to seek cover from the enemy.  Although the enemy did crawl under the tree in order to remove serviceable uniform items and equipment from SGT Johnson's body, a preponderance of the evidence suggests the enemy would not have crawled under this tree merely in an effort to dispose of SGT Johnson's body after he was killed.

(U//FOUO)  It took search and recovery forces two days to find SGT Johnson's body because they concentrated their search in the area immediately surrounding the initial attack and his last known location.  SGT Johnson had evaded approximately 960 meters from his last known location and approximately 1.6 km from the initial attack site.

(U) RECOMMENDATION.  None.

## APPOINTING AUTHORITY ACTION

**(U) Finding 14 is approved with comment.**

*(U//FOUO) COMMENT:*  The Investigating Officer and his team conducted an exhaustive and thorough review of all the facts surrounding the deaths of these Soldiers.  The conclusions are based on all available evidence.  I am confident this finding is the most accurate as possible reflection of the facts and circumstances surrounding the final moments of these courageous Soldiers' lives.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 15**

(U//~~FOUO~~) **INVESTIGATION FINDING 15**:  SGT LaDavid Johnson did not have a Friendly Force Tracker (FFT) when he was separated from Team OUALLAM.

(U) Discussion.

(~~S~~) As discussed in detail in Annex 2, Team OUALLAM had one FFT with them on 3-4 October 2017 and it was located on the dashboard of USV1.  SGT Johnson did not have an FFT.  Reports that an FFT that SGT Johnson may have been carrying [(b)(1) 1.4g] to search and rescue teams are erroneous.

(~~S~~) There were [(b)(1)1.4g] beacons", "SHOUT Nano hits", or "comms hits" reported as coming from Team OUALLAM or even specifically from SGT LaDavid Johnson.  All of those reports proved false.  No signal was ever received from the one SHOUT Nano device carried in USV1 by Team OUALLAM, no calls were detected from any of the team's assigned or personal communications equipment, and no distress signals were received from any of the team's Personnel Recovery (PR) equipment.

(U//~~FOUO~~) The preponderance of the evidence indicates that none of these reported signals came from equipment associated with any member of Team OUALLAM.  Rather the evidence suggests that the technology, capabilities, and limitations of the SHOUT Nanos were not well understood outside of the USAFRICOM and SOCAFRICA Joint Personnel Recovery Cells (JPRCs).

(~~S~~) [(b)(1) 1.4a, (b)(1)1.4g]
[(b)(1) 1.4a, (b)(1)1.4g]
[(b)(1) 1.4a, (b)(1)1.4g] That misinterpretation was very difficult to correct once it was posted in the various [(b)(1) 1.4a, (b)(1) 1.4g] [(b)(1) 1.4a, (b)(1) 1.4g]

(~~S~~) Some [(b)(1) 1.4a, (b)(1)1.4] signals were also erroneously characterized as "beacons" and wrongly assumed to have originated with SGT Johnson.  The fundamental lack of understanding about [(b)(1) 1.4a, (b)(1)1.4g]
[(b)(1) 1.4a, (b)(1)1.4g] led to the characterization of unrelated [(b)(1) 1.4a, (b)(1)1.4g]
[(b)(1) 1.4a, (b)(1)1.4g] belonging to Team OUALLAM.  That resulted in [(b)(1) 1.4a]
[(b)(1) 1.4a] deploying to conduct one ground and one aerial reconnaissance mission for [(b)(1) 1.4a]
[(b)(1) 1.4a] French personnel and equipment were unnecessarily placed at risk based on those inaccurate reports. The confusion [(b)(1) 1.4a] also resulted in ISR platforms being directed to [(b)(1) 1.4a] different locations, at least once by [(b)(1) 1.4a] ISR platform, to investigate these reports.  None of the Iridium, or [(b)(1) 1.4a, (b)(1)1.4] signals detected between 4-6 October were associated with any member of Team OUALLAM.

(U) RECOMMENDATION:  See findings 18 and 19 for recommendations.

SECRET//NOFORN

SECRET//NOFORN

## APPOINTING AUTHORITY ACTION

**(U) Finding 15 is approved with comment.**

*(S) COMMENT:*  SOCAFRICA, with the assistance of USSOCOM, is now fielding friendly force trackers (FFTs) [(b)(1) 1.4a, (b)(1) 1.4g]

(U//FOUO) I am directing SOCAFRICA codify this requirement and make it standard throughout the SOCAFRICA area of responsibility.

SECRET//NOFORN

SECRET//NOFORN

## FINDING 16

(U//~~FOUO~~) **INVESTIGATION FINDING 16**:  Individual members of Team OUALLAM performed numerous acts of bravery while under fire on 4 October 2017.

(U//~~FOUO~~) DISCUSSION.  In a fight where the enemy had a three to one advantage and were equipped with medium and heavy machine guns, including PKMs (7.62 x 54mm) and DShKs (12.7 x 108mm), rocket propelled grenades (RPGs), and mortars, members of Team OUALLAM and several of their Nigerien partners performed numerous acts of bravery.  Those acts undoubtedly saved the lives of Nigeriens and Americans alike.

(U//~~FOUO~~) RECOMMENDATION. This report and the associated exhibits should be forwarded to the Commander USSOCOM to review for appropriate recognition.

## APPOINTING AUTHORITY ACTION

**(U) Finding 16 is approved with comment.**

*(U) COMMENT:*  Numerous acts of valor took place on the battlefield that warrant review for appropriate recognition.  I concur with and approve the Finding and Recommendation. USAFRICOM will assist by providing any additional information and support to the appropriate approval authority.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 17**

(U//~~FOUO~~) **INVESTIGATION FINDING 17**:  The French and Nigerien aerial and ground response was instrumental in saving the lives of the remaining team members.

(U) DISCUSSION:

(~~S~~) SOCCE-LCB initiated their request for French  support when Team OUALLAM reported that they were in contact with the enemy.  One of the members of SOCCE-LCB was an LNO to the French Task Force (Task Force BARKHANE) co-located in N'Djamena, Chad.  Upon declaration of the TIC, SOCCE-LCB called the LNO and requested TF BARKHANE support, particularly with TF BARKHANE's fixed wing assets (Mirage 2000) from Niamey, Niger.  (b)(1) 1.4a, (b)(1) 1.4d  (b)(1) 1.4a, d  Mirages in Niamey, Niger.

(~~S~~) Upon notification, the Mirages (b)(1) 1.4a took off (b)(1) 1.4a, g  The French Mirages were on station within seven minutes and immediately conducted two, single ship shows of force with a southeast offset from the TIC site at 1320 and 1325.  Those two shows of force occurred at approximately the same time that the remaining members of Team OUALLAM were establishing their defensive position in the Alamo.  While none of the team members specifically remember these two shows of force, a preponderance of the evidence indicates that they caused the enemy to abandon their battlefield recovery efforts on the TIC site itself.

(~~S~~) After conducting (b)(1) 1.4d, (b)(1) 1.4g the Mirages performed two more shows of force at 1458 and 1519 directly over the Alamo position from south to north.  Team members recall those two shows of force as instrumental in forcing the enemy to move away from their position and abandon the search for them.  The French Mirages stayed on station until 1853 (aside from (b)(1) 1.4d, (b)(1) 1.4g additional aerial refuelings), but did not conduct any more shows of force.

(~~S~~) (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g When the French Mirages came on station, they performed the first two shows of force before establishing communication (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g Team OUALLAM wanted the Mirages to drop ordnance, (b)(1) 1.4a, (b)(1) 1.4g (b)(1) 1.4a, (b)(1) 1.4g



(~~S~~) The Nigerien response was also immediate.  (b)(1) 1.4g of the TIC, (b)(6) (b)(6) the (b)(1) 1.4a, d commander, launched a ground QRF from (b)(1) 1.4a, (b)(1) 1.4d (b)(1) 1.4a, (b)(1) 1.4d  In addition, he launched a Gazelle helicopter from (b)(1) 1.4a, (b)(1) 1.4d that was the first aerial platform to arrive at the TIC site.  The Nigerien helicopter was later moved off station to de-conflict with the French Mirages' shows of force.

SECRET//NOFORN

SECRET//NOFORN

(S) RECOMMENDATION: Recommend the SOCAFRICA commander continue to develop the relationship with French and Nigerien forces, and include them in CONOPS development and planning to the maximum extent possible.

(b)(1) 1.4a

(b)(1) 1.4a

(b)(1) 1.4a

## APPOINTING AUTHORITY ACTION

**(U) Finding 17 is approved with comment.**

*(U//FOUO) COMMENT:*  USAFRICOM will also maintain our close working relationship with French and Nigerien forces regarding operations in Africa.  In the Sahel, these relationships reflect AFRICOM's "By, With, and Through" approach designed to achieve U.S. strategic objectives in Africa by enabling the security forces of partnered nations who have compatible strategic objectives.  This approach places an emphasis on U.S. military capabilities employed in a supporting role, not as principal participants in armed conflict.

(U//FOUO) The approach requires a cooperative relationship which was validated when French and Nigerien forces responded to our call for assistance during the execution of the recovery and evacuation of our forces.

(U//FOUO) The USAFRICOM staff will evaluate the report of investigation and make recommendations on how to best acknowledge the performance of individuals or specific units with the French and Nigerien military forces who should be recognized for their actions in support of U.S. forces on 4 October 2017.

SECRET//NOFORN

SECRET//NOFORN

## FINDING 18

(S//NF) INVESTIGATION FINDING 18: USAFRICOM's request for (b)(1) 1.4a, (b)(1)1.4c, (b)(1)1.4g (b)(1) 1.4a, (b)(1)1.4c, (b)(1) 1.4g was not part of the standard processes and procedures used for Personnel Recovery (PR) events.

(U//FOUO) DISCUSSION: This paragraph is classified above the classification of this report. Refer to Annex 2 for details.

(S//NF) RECOMMENDATION: (S//NF) Recommend referral of this finding to the Joint Staff to determine whether a comprehensive Department-wide review (b)(1) 1.4c, (b)(1) 1.4g (b)(1) 1.4c, (b)(1) 1.4g is necessary. In particular, the DOD needs to re-evaluate the

(b)(1) 1.4c, (b)(1) 1.4g

## APPOINTING AUTHORITY ACTION

**(U) Finding 18 is approved as modified.**

*(U//FOUO) MODIFIED RECOMMENDATION:* As reflected in Finding 15, every U.S. person participating in approved train/advise/assist/accompany operations in Africa should be carrying a friendly force tracker (FFT). It is equally as important the FFT devices employed by the force are fully integrated into robust national personnel recovery networks.

(U//FOUO) I direct the AFRICOM Joint Personnel Recover Center (JPRC) conduct a holistic review, in coordination with USSOCOM and SOCAFRICA, as appropriate, of the adequacy of FFTs employed in the AFRICOM AOR. The JPRC will present their findings and propose appropriate modifications to the AFRICOM PR Instruction implementing new guidelines on interagency coordination.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 19**

(S) **INVESTIGATION FINDING 19**: [(b)(1) 1.4a, (b)(1)1.4g] and improper use of the mIRC battle management tool reduced situational awareness, caused confusion, and resulted in a disjointed crisis response.

(U) DISCUSSION:

(S) The [1.4g] battle management tool used during the TIC was mIRC, an Internet Relay Chat client for Windows that is a fully functional chat utility. It is used [(b)(1) 1.4a, (b)(1)1.4g] to develop shared understanding of the battlefield across the entire battlespace. The main mIRC channel window used during the TIC [(b)(1) 1.4a] was created by the ISR Tactical Controllers (ITCs) in the SOCAFRICA JSOAC soon after the TIC was declared. This soon became the de facto Operations mIRC channel and at times had [(b)(1) 1.4a] members monitoring and commenting in the channel.

(S) Designed to cross-level information in order to provide commanders [(b)(1) 1.4a, (b)(1)1.4g] the information [(b)(1) 1.4a, (b)(1)1.4g] this mIRC channel instead became a clearing house [(b)(1) 1.4a, (b)(1)1.4g] There was no control or oversight [(b)(1) 1.4a, (b)(1)1.4g] Misinformation flourished and delayed attempts at gaining situational awareness. Legacy mIRC handles caused confusion [a/g] [(b)(1) 1.4a, (b)(1)1.4g]

(S) In one instance, erroneous information was posted that two U.S. wounded had been picked up by French helicopters. When Team OUALLAM on the ground was asked if it was their wounded that had been picked up, they responded that it was not, but believed it could have been two of their other members who had been separated from them. The benefits of mIRC can also be its flaw. To the extent mIRC allows for flattened communications and shared understanding [(b)(1)1.4g] when imprecise information is shared it risks further confusion. For example, initial reports from Team OUALLAM of five missing personnel included an accounting of their missing interpreter who had also been separated from the Team. Subsequent mIRC communications sought to clarify the nationalities of the five MIA. Approximately 35 minutes after the initial report in mIRC, a message listed the five MIA as "5 x US MIA." A flurry of messages followed regarding five U.S. MIA, adding confusion [(b)(1)1.4g]

(U) RECOMMENDATION: Recommend SOCAFRICA commander develop business rules/SOPs for the use of mIRC and propagate at all subordinate echelons of command. Designate "owners" of standing functional and command channels and ensure they enforce chat discipline within their channels. Leverage existing multi-echelon exercises to train on and rehearse this and other battle management tools at a frequency that will ensure all members of the command are properly trained. Integrate outside agencies and commands that habitually support theater operations into these exercises.

SECRET//NOFORN

SECRET//NOFORN

## APPOINTING AUTHORITY ACTION

**(U) Finding 19 is approved with no additional comment.**

SECRET//NOFORN

SECRET//NOFORN

**FINDING 20**

(S//NF) **INVESTIGATIONS FINDING 20**:  The 4 October 2017 attack was not the result of an intelligence failure.  Rather, limitations on ▨(b)(1) 1.4c, (b)(1) 1.4g▨ activities in Niger contributed to Team OUALLAM's and the Intelligence Community's ▨(b)(1) 1.4c, (b)(1) 1.4g▨ ▨(b)(1) 1.4c, (b)(1) 1.4g▨ of an attack.

(U) DISCUSSION:

(U//FOUO) There is no formal definition of "intelligence failure" in Department of Defense or Intelligence Community publications, but the investigating team has determined an "intelligence failure" to be an event that the Intelligence Community failed to predict *even though there were sufficient indicators to inform an assessment.*

(S//NF) Global collection prioritization, collection platform availability, ▨(b)(1)1.4c, (b)(1)1.4g▨ ▨(b)(1)1.4c, (b)(1)1.4g▨ and other issues all generate significant gaps in intelligence regarding ▨(b)(1)1.4c, (b)(1)1.4g▨ in Niger and throughout Africa.  These gaps have been thoroughly documented by USAFRICOM and briefed to the Joint Staff and Congress in USAFRICOM's 2017 Posture Statement and the 2017 Commander's Annual Joint Assessment.  USAFRICOM's 2017 Counter-VEO Campaign Assessment stated " Only a fraction of USAFRICOM's ISR requirements are met.  This limits situational understanding, support to operations, and fails to offer adequate threat indications and warnings."  An inability to *collect* intelligence, however, does not equate to an intelligence failure.

(U//FOUO) Team OUALLAM and AOB Niger had full access to the intelligence resources and assets available to them at the time they planned the 3 and 4 October 2017 missions.  Working with their Partner Forces, Team OUALLAM  and AOB Niger were aware of the VEO attacks in the Tillabéri region in the previous 12 months, as well as the sophisticated tactics, techniques and procedures (TTPs) demonstrated by VEOs.  Despite this precedent for attacks against security forces in the region, no information existed to suggest a specific threat of ambush by VEOs against U.S. forces.  Consequently, Team OUALLAM and AOB Niger did not believe the enemy would attack U.S. forces.

(S//NF) Team OUALLAM and AOB Niger lacked ▨(b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g▨ ▨(b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g▨ ▨(b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g▨ which could have led to a more thorough consideration of the risk involved and, ultimately, avoided or prevented the 4 October 2017 attack at Tongo Tongo.

(S//NF) ▨(b)(1) 1.4c, (b)(1) 1.4g▨

▨(b)(1) 1.4c, (b)(1) 1.4g▨

▨(b)(1) 1.4c, (b)(1) 1.4g▨

SECRET//NOFORN

SECRET//NOFORN

(S) [ (b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g ]
[ (b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g ]

(S//NF) RECOMMENDATION:  Recommend Commander, USAFRICOM direct the USAFRICOM staff to engage with the Niger Country Team, [ (b)(1) 1.4c, (b)(1) 1.4g ] [ (b)(1) 1.4c, (b)(1) 1.4g ] authorities and limitations currently in place in Niger.  Recommend Commander, USAFRICOM direct the USAFRICOM staff to develop an appropriate framework with the Niger Country Team that will allow USSOF working in Niger to maximize the use of [ (b)(1) 1.4c, (b)(1) 1.4g ] capabilities [ (b)(1) 1.4c, (b)(1) 1.4g ]

## APPOINTING AUTHORITY ACTION

**(U) Finding 20 is approved as modified with comment.**

*(U//FOUO) MODIFIED FINDING:*  SOCAFRICA's assessment of the operational environment leading up to the events of 4 October 2017 was informed by all available sources of information, and we do not assess any intelligence was overlooked, withheld, misinterpreted or otherwise mishandled that would meet commonly-accepted definitions of the term "intelligence failure."

(S//NF) In early October 2017, the SOCAFRICA chain of command – especially at the Group and Battalion levels and below - and their Nigerien partner force were continually aware of the trends indicating the potential for enemy contact in the region, but had no specific indicators or warnings that an attack of the size and scope that occurred was imminent.  Rather, tactical surprise achieved by the enemy was due in part to intelligence gaps in terms of available [ (b)(1) 1.4c, (b)(1) 1.4g ] [ (b)(1) 1.4c, (b)(1) 1.4g ] that may have given clues or warnings about the intentions of the enemy force.

(S//NF) USAFRICOM has documented its collection shortfalls such as ISR.  Improvements to USAFRICOM's intelligence collection, processing, exploitation, and dissemination shortfalls would reduce—but not eliminate—the likelihood of future tactical surprise.  Limitations on [ (b)(1) 1.4c, (b)(1) 1.4g ] activities in Niger may have contributed to the intelligence gaps in the [ (b)(1) 1.4c, (b)(1) 1.4g ] during the timeframe of the ambush on [ (b)(3) / (b)(6) ] and their partner force.  The lack of available collection required for [ (b)(1) 1.4c, (b)(1) 1.4g ] [ (b)(1) 1.4c, (b)(1) 1.4g ] is specifically identified as a contributing factor.

*(S//NF) MODIFIED RECOMMENDATION:*  I direct the USAFRICOM J2 to engage with appropriate organizations in Niger and throughout the USAFRICOM Area of Responsibility to ensure [ (b)(1) 1.4a, (b)(1) 1.4c, (b)(1) 1.4g ] capabilities are maximized through existing deconfliction frameworks.

*(S//NF) COMMENT:*  On the issue of whether there was an intelligence gap with regard to [ (b)(1) 1.4c, (b)(1) 1.4g ] the Finding, as modified, is approved.  However, [ (b)(1) 1.4c, (b)(1) 1.4g ] is only part of the broader intelligence picture.  The USAFRICOM J2 will continue to work with component intelligence directorates, the Intelligence Community, and partner intelligence assets to improve collection and minimize gaps.

SECRET//NOFORN

SECRET//NOFORN

## FINDING 21

**(U//FOUO) INVESTIGATION FINDING 21**:  The response time of PR and CASEVAC did not affect the outcome of the events of 4 October 2017.

(U//FOUO) DISCUSSION:  All four Soldiers KIA on 4 October 2017 sustained wounds that would have been immediately fatal or fatal in a short time, and were deceased by the time the initial site was accessible to PR assets.  Both Soldiers wounded in action sustained injuries that were managed expeditiously by Team members pursuant to pre-deployment training they had received in prolonged field care.

(U//FOUO) RECOMMENDATION**:**  Recommend SOCAFRICA and service components sustain prolonged field care training programs.

## APPOINTING AUTHORITY ACTION

**(U) Finding 21 is approved as modified with comment.**

*(U//FOUO) MODIFIED RECOMMENDATION:* Recommend SOCAFRICA sustain prolonged field care training programs and all other service components implement similar training before deploying to theater.

*(U//FOUO) COMMENT:*  The report of investigation and all available evidence indicates our four fallen Soldiers sustained immediately fatal, or rapidly fatal wounds.  Consequently, no amount of PR or CASEVAC assets would have saved these Soldiers' lives.  PR/CASEVAC assets available in Niger were able to evacuate wounded Soldiers in sufficient time to receive emergency care.

(U//FOUO) This finding underscores the importance of AFRICOM's layered approach to emergency medical care.  This finding supports sustaining Tactical Combat Casualty Care (TC3) training for all AFRICOM deployed forces to improve self-aid and buddy care, training and equipping forces with the Combat Application Tourniquet, and improving radio communication and interoperability between all evacuation platforms and damage control surgical teams.

SECRET//NOFORN

SECRET//NOFORN

**FINDING 22**

(U//~~FOUO~~)  **INVESTIGATION FINDING 22**:  USAFRICOM Personnel Recovery Command and Control system had not been thoroughly rehearsed to ensure a timely, effective, and integrated response during contingency operations in Niger.

(U) DISCUSSION:

(U//~~FOUO~~) Communication between command elements was hampered by the inefficient use of mIRC (see finding 19) and loss of direct communication with Team OUALLAM.  One impact of the poor communication was a three-hour delay from the notification of wounded U.S. Soldiers until a PR event was declared.  Although this did not directly affect the end result of the event, it highlights the need for greater efficiency.

(U//~~FOUO~~) USAFRICOM exercises with an emphasis on PR (e.g. JUDICIOUS RESPONSE and EPIC GUARDIAN) are high-level large-scale exercises that did not adequately prepare the Command for PR execution during this real-world event.  The last dedicated 'live' PR exercise for West Africa was led by JSOAD-Niger in May 2016.  During that exercise, JSOAD-Niger attempted to identify and develop corrections for friction points that could hamper successful PR events. Several of the observations and lessons identified during that exercise were factors hampering recovery efforts for Team OUALLAM.  Two examples of these lessons identified are the need for all agencies to focus on communication discipline and the utility of regular situational reports on mIRC.

(S) USAFRICOM's limited footprint in Western Africa reinforces the need for close relationships with allied and partner nations to ensure successful operations.  During this event, it was apparent that little pre-coordination, integrated training, or rehearsals had been conducted (see finding 10.).

| (b)(1) 1.4a, (b)(1)1.4g |
|---|
| (b)(1) 1.4a, (b)(1)1.4g |

(U//~~FOUO~~) The lack of integrated PR practice was made apparent when several agencies were confused about PR roles and responsibilities.  As a result, no pilot was declared the on-scene commander (air) to take full control of the airspace over the event in order to provide direction to the assets responding to the event.  These issues stem from the lack of checklist execution by C2 agencies and doctrinal misunderstandings by units responding to a PR event.

(U) RECOMMENDATIONS:

(U//~~FOUO~~) Recommend USAFRICOM JPRC conduct a complete review of the Command's PR program with particular focus on command and control relationships, and foreign partner roles and responsibilities.

(U//~~FOUO~~) Recommend USAFRICOM ensure the Command exercise program specifically exercises coordination and integration of PR efforts across all echelons of command.

SECRET//NOFORN

SECRET//NOFORN

Recommend this program include regularly scheduled, small-scale training events that stress checklist execution/refinement and partner integration.

## APPOINTING AUTHORITY ACTION

**(U) Finding 22 is approved with no additional comment.**

SECRET//NOFORN

SECRET//NOFORN

**FINDING 23**

(U//~~FOUO~~)  **INVESTIGATION FINDING 23**:  The contracted MEDEVAC/CASEVAC capability in Niger does not meet USAFRICOM's Personnel Recovery requirement for operations against VEOs operating in West Africa.

(U) DISCUSSION:

(U//~~FOUO~~) The Search and Rescue (SAR) contract in Niamey, Niger was established in October 2014 to mitigate the risk-to-force caused by an unsourced PR Task Force (PRTF) request submitted by USAFRICOM.  The contract requires Berry Aviation to provide 24/7 dedicated rotary-wing and Short Take Off and Landing fixed-wing aircraft, and paramedic-level field and in-flight patient care for PR, CASEVAC, airlift (passenger, cargo, or combination), and airdrop services.  Berry Aviation aircraft are required to be capable of launching within 1-hour of notification (N+1).

(~~S~~) The Berry contracted aircraft lack a robust communication package and [(b)(1) 1.4a, (b)(1) 1.4g] capability.  This means the Berry aircraft are more akin to the Life Flight capability [(b)(1) 1.4a/g] [(b)(1) 1.4a, (b)(1)1.4g] In contrast, a dedicated PRTF consists of military aircraft that are traditionally equipped with [(b)(1) 1.4a/g] [(b)(1) 1.4a, (b)(1)1.4g] Additionally, PRTFs have extensive [(b)(1) 1.4a, (b)(1)1.4g] teams that enable them to conduct the full spectrum of PR operations.

(~~C~~) Task Force BARKHANE's ability to effect a landing on an uncertain landing zone was based on their standard [(b)(1)1.4d, (b)(1)1.4g] package [(b)(1)1.4d, (b)(1)1.4g] [(b)(1)1.4d, (b)(1)1.4g]

(~~S~~) RECOMMENDATION:  Recommend USAFRICOM reassess minimum MEDEVAC/CASEVAC requirements based upon increased [(b)(1) 1.4d, (b)(1) 1.4g,] [(b)(1) 1.4d, (b)(1) 1.4g] [(b)(1) 1.4d, (b)(1) 1.4g] Recommend Commander, USAFRICOM direct SOCAFRICA commander to re-evaluate their CONOPS risk-assessment criteria based on the restricted PR capability afforded by contracted CASEVAC.

**APPOINTING AUTHORITY ACTION**

**(U) Finding 23 is disapproved with comment.**

*(U//~~FOUO~~) COMMENT:*  I disapprove this finding because it conflates Personnel Recovery requirements with capabilities provided through contracted Casualty Evacuation assets.

*(~~S~~) COMMENT:*  As it pertains to casualty evacuation (CASEVAC), the existing contract is sufficient.  The AFRICOM area of responsibility differs from Afghanistan or Iraq by virtue of the vast geographic scope, limited basing, and the relatively small number of U.S. personnel deployed across the continent.  These factors make more familiar response periods, [(b)(1) 1.4d] [(b)(1) 1.4d] in the CENTCOM area of responsibility,

SECRET//NOFORN

SECRET//NOFORN

impracticable.  In addition to the CASEVAC contract, AFRICOM and SOCAFRICA mitigate risks associated with increased CASEVAC response times by entering into resource sharing agreements with [(b)(1) 1.4d] partner nations in order to provide tactical evacuation in non-permissive or semi-permissive environments.

*(U//FOUO) COMMENT:*  This investigation does underscore the importance of fully considering CASEVAC response times and the proximity and availability of damage control surgery assets in operation risk assessments.  Proper risk mitigation requires advanced coordination with partner forces, as detailed in Finding 10, on whom U.S. forces will rely to provide immediate tactical evacuation.  Lengthy response times or potential unavailability of partner assets, due to partner operational requirements or otherwise, must be considered by commanders before approving operations.

SECRET//NOFORN