UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION *and* AMERICAN CIVIL LIBERTIES UNION FOUNDATION, | **MEMORANDUM OPINION** |
| Plaintiffs, | |
| – *against* – | 17 Civ. 9972 (ER) |
| DEPARTMENT OF DEFENSE, DEPARTMENT OF JUSTICE, *and* DEPARTMENT OF STATE, | |
| Defendants. | |
| THE NEW YORK TIMES COMPANY, | |
| Plaintiff, | |
| – *against* – | 20 Civ. 43 (ER) |
| DEPARTMENT OF DEFENSE, | |
| Defendant. | |

RAMOS, D.J.:

In 2013, the Obama Administration codified the procedures and criteria it used in identifying which suspected terrorists it would attempt to capture or kill abroad. According to September and October 2017 articles in the *New York Times*, the Trump Administration changed those policies in October 2017.  Two years later, a report made public by the Department of Defense examining an ambush that killed four U.S. soldiers in Niger disclosed information seemingly confirming the *Times*' reporting.

Now, both the *Times* and the American Civil Liberties Union seek to secure disclosure of those updated polices through a lawsuit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Although the Defense Department has declined to confirm or deny the existence of such guidance, this Court finds that it may no longer

maintain that response.  As a review of the report concerning the Niger ambush makes

clear, there is no doubt that these policies governing operations of the Defense

Department have been updated since the Obama Administration's 2013 guidance.

Accordingly, the Court DENIED the Defense Department's motion for summary

judgment in these cases and GRANTED the cross-motions of both the ACLU and the

*Times* in a September 29, 2020, Order.  Doc. XX.  This Memorandum Opinion explains

the reasons for that Order.

I.      **BACKGROUND**[1]

    **A. The Obama Guidance & Its Purported Update**

In 2013, as the so-called War on Terrorism approached its twelfth year, then-

President Barack Obama announced that his administration had formalized its policies for

approving operations that sought to capture or kill persons identified by the United States

as terrorists located outside the United States and outside areas of active hostilities. The

Obama administration simultaneously released a fact sheet outlining those policies on

May 23, 2013.[2]  The full policy was contained document titled "Procedures for

Approving Direct Action Against Terrorist Targets Located Outside the United States and

Areas of Active Hostilities," or "Presidential Policy Guidance" ("PPG"), dated May 22,

2013.[3]  Although the full document was originally classified by the National Security

Council, Knight Decl. ¶ 9, Doc. 30, the ACLU secured the release of a redacted version

in August 2016 through a FOIA action against the Department of Justice, the Department

of Defense, the Department of State, and the Central Intelligence Agency.  *See ACLU v.*

*Dep't of Justice*, No. 15 Civ. 1954 (CM), 2016 WL 8259331, at **14–22 (S.D.N.Y. Aug.

---

[1] All documents referenced are those filed in No. 17 Civ. 9972 unless otherwise noted.

[2] Press Release, Office of the Press Secretary, White House, Fact Sheet: U.S. Policy Standards and Procedures for the Use of Force in Counterterrorism Operations Outside the United States and Areas of Active Hostilities (May 23, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/05/23/fact-sheet-us-policy-standards-and-procedures-use-force-counterterrorism.

[3] Available at https://www.justice.gov/oip/foia-library/procedures_for_approving_direct_action_against _terrorist_targets/download.  *See also* Knight Decl. ¶ 8, Doc. 30.

8, 2016), *vacated in irrelevant part*, 894 F.3d 490 (2d Cir. 2018) (directing district court to vacate finding of official acknowledgment about a document irrelevant to this case).

The Obama Guidance prioritized capturing suspects, limiting lethal operations to "when capture of an individual is not feasible and no other reasonable alternatives exist to effectively address the threat." PPG at 1. It directed that these operations only be attempted when the United States has identified and located the target with near certainty, and when there is a near certainty that non-combatants will not be harmed. *Id.* Only those individuals who pose a "continuing, imminent threat to U.S. persons" would be eligible to be targeted for a lethal operation. *Id.* § 3.A. Notably, the Obama Guidance directed that all of these operations go through a multi-step interagency review, including by members of the Principals and Deputies Committees of the National Security Council[4] before being approved by the President himself. *Id.* §§ 1.B, 1.G, 1.H.

According to reporting by the *New York Times*, President Donald J. Trump issued new rules in October 2017, called "Principles, Standards and Procedures" or "P.S.P.", which relaxed the Obama Guidance's policies governing which suspected terrorists may be targeted to be killed and the rigor of the interagency review process for individual operations. *See* Charlie Savage & Eric Schmitt, *Trump Poised to Drop Some Limits on Drone Strikes and Commando Raids*, N.Y. Times (Sept. 21, 2017), https://nyti.ms/35RXW6W (reporting that the changes were under consideration per "officials familiar with internal deliberations"); Charlie Savage, *Will Congress Ever Limit the Forever-Expanding 9/11 War?*, N.Y. Times (Oct. 28, 2017), https://nyti.ms/2yTGUmc (reporting that the President "had recently signed his new rules," per "[t]wo government officials").

---

[4] At the time, the regular members of the Principals Committee included the Secretaries of State, Treasury, Defense, Energy, and Homeland Security, the Attorney General, the Director of the Office of Management and Budget, the U.S. Representative to the United Nations, the President's Chief of Staff, the Director of National Intelligence, and the Chairman of the Joint Chiefs of Staff. Presidential Policy Directive 1: Organization of the National Security Council System at 2–3 (Feb. 13, 2009), https://fas.org/irp/offdocs/ppd/ppd-1.pdf. The Deputies Committee included the deputies of the members of the Principals Committee. *Id.* at 4.

In response, the ACLU filed a FOIA request with the Department of Justice, the Department of State, and the Department of Defense seeking, "the release of the Trump administration's rules governing the use of lethal force abroad, known as the "Principles, Standards, and Procedures," as well as any cover letter or other document attached thereto." Hogle Decl. ex. 1 ("ACLU Request") at 5–6, Doc. 34. The request clarified that it "should be construed to include the record containing the Trump administration's rules governing the use of lethal force as described in [the *Times*' reporting], even if the final version of this document bears a different title or form than that specifically requested here." *Id.* at 6 n.21.

When the ACLU did not receive a decision on its FOIA request from any of the agencies, it filed suit before this Court in December 2017. Doc. 1. The agencies filed their answer in February 2018, declining to confirm or deny the existence of records responsive to the ACLU's Request. Doc. 14 at 9.

### B. The Niger Ambush Report

In June 2019, the Department of Defense transmitted to journalists a redacted version of the results of an investigation into a deadly October 2017 ambush on U.S. soldiers and their local partners in Tongo Tongo, Niger by forces affiliated with the Islamic State. Hogle Decl. ex. 2.4 at 2; *see also* Schmitt Decl. ex. A, No. 20 Civ. 43, Doc. 19 (containing email to journalists from Defense Department spokesperson Cdr. Candice Tresch). The report — which sent investigators to five countries, included 143 interviews, and was supervised by Maj. Gen. Roger J. Cloutier, Jr., Hogle Decl. ex. 2.7 at 2 — made numerous findings regarding the cause of the casualties and actions necessary to rectify those shortcomings.

According to the report, U.S forces had been stationed in Niger to train, advise, assist, and accompany Nigerien forces in the country's operations against Islamic militants. Hogle Decl. ex. 2.1 ¶ 4. The report indicated that on the day of the ambush, a U.S. special operations team, called "Team OUALLAM," was dispatched to find and

4

capture a leader of the Islamic State in Iraq and Syria — Greater Sahara.  *Id.*  The team, accompanied by Nigerien partners, was unable to find the leader, and, as they were returning to their base, stopped at the village of Tongo Tongo for water and to speak with village elders.  *Id.* at 4.  As the team left the village, they were ambushed by a large force of militants, leading to the death of four U.S. soldiers and four of their Nigerien partners.  *Id.*

Most relevant to this case is Investigation Finding 2, which discussed the active and exclusive role U.S. forces had taken in planning and executing direct action missions — a role that likely conflicted with White House policies.  Hogle Decl. ex. 2.7 at 109.  The finding began by noting, "On 3 October 2017, the Executive Policy governing direct action against terrorists on the continent in Africa was codified in the 'U.S. Policy Standards and Procedures for the use of force in counterterrorism operations outside the United States and areas of active hostilities,' (CT-PPG)."[5]  Hogle Decl. ex. 2.3 at 8.  It continued:

> Since 3 October, the President has issued new guidance on [RE-DACTED].  The PSP supersedes the CT-PPG and makes substantive changes to the standards and procedures for approval of U.S. direct action missions, but the core principle remains the same:  decisions to use U.S. forces to conduct [REDACTED] will be made at the most senior levels after reasonable review and considerable oversight.

Hogle Decl. ex. 2.7 at 109.  The report further noted, "[T]he CT-PPG itself is classified above the classification of this report, but the Obama Administration published an unclassified 'Fact Sheet' outlining the principles of the policy for public release."  *Id.* at n.819.

The report found that Team OUALLAM's actions under the "advise, assist, and accompany" umbrella "more closely resembled U.S. direct action than foreign partner-led

---

[5] Although the phrase "direct action against terrorists" is redacted in the underlying report, Hogle Decl. ex. 2.7 at 109, the summary table of findings discloses this phrase.  In a glossary, the report defines "CT-PPG" as "Counterterrorism-Presidential Policy Guidance." Ex. 2.7 at 169.

operations aided by U.S. advice and assistance." Hogle Decl. ex. 2.7 at 109.  In short, it was U.S. forces in Niger that had made the decision to pursue the Islamic State leader — not the Nigeriens or high-level U.S. military leadership.  *Id.*  Furthermore, the report observed that members of U.S. forces "expressed a casual understanding of" and "an equally casual application of" rules governing their interactions with Nigerien partners. *Id.* at 111.

The report concluded that there existed "several problems with the advise, assist, and accompany activity as it relates to the CT-PPG and the PSP," observing:

> Exercised conservatively, with advisors remaining far from the fight, advising higher echelon commanders, the policy [of advise, assist, and accompany] could be executed in accordance with Presidential Policy.  Exercised aggressively, with U.S. advisors accompanying platoons, squads, and fire teams, the direct actions of our partners cannot be distinguished from U.S. direct action.

Hogle Decl. ex. 2.6 at 111–12.  Based on these findings, the report recommended that U.S. Africa Command "provide a clear and unequivocal standard to the force for advise, assist, and accompany operations that is consistent with Presidential Policy as it relates to U.S. direct action in Africa and ensure it is understood and enforced by Commanders." *Id.* at 111–12.  The report made no unclassified recommendations regarding changes to U.S. or Africa Command policies.  *Id.* at 112.

Cloutier concluded his investigation on January 31, 2018.  Hogle Decl. ex. 2.6 at 1.  The report was approved with comments by the commander of U.S. Africa Command, Gen. Thomas D. Waldhauser, *id.* at 4, who eventually transmitted the findings and recommendations to the Secretary of Defense in February 2018, Hogle Decl. ex. 2.1.  In his memorandum to the Secretary, Waldhauser noted that "U.S. forces in Niger have been operating in accordance with guidance formulated at the Presidential level." *Id.* ¶ 4.  He further explained that the success of his forces' mission in Niger required, *inter alia*, that "commanders at each level [] understand their authorities, assess known and foreseeable

risks, and then articulate these factors in a manner commensurate with their echelon of command." *Id.* ¶ 8.

Based on the disclosure of this report, including the contents of Finding 2, the ACLU wrote to the Defense Department in June 2019 asking that they confirm or deny the existence of updates to the Obama Guidance.  Hogle Decl. ex. 3.  The Department again declined to do so.  Hogle Decl. ex. 4.  In October 2019, the *Times* filed a lawsuit against the Defense Department seeking a response to an October 7, 2019, FOIA Request asking for "access to (and declassification review of, if necessary) the document (including any annexes or appendices) in which President Trump laid out a revised set of principles, standards, and procedures for counterterrorism kill-or-capture operations, replacing the Obama-era 'Presidential Policy Guidance' rules."  Compl., No. 20 Civ. 43, ¶ 9, Doc. 1.  That case was assigned to this Court as related to the ACLU's case in January 2020.  In its answer filed in February 2020, the Department likewise declined to confirm or deny the existence of responsive records.  Doc. 12.  In February 2020, briefing began on cross-motions for summary judgment in both cases.

### C. The Knight Declaration

In its briefing, the Department of Defense[6] relies on the Declaration of Ellen J. Knight, then-Senior Director for Records Access and Information Security Management at the National Security Council, the agency that initially classified the Obama Guidance. Authorized to assess the classification of information related to the Council, Knight Decl. ¶ 2, Knight opines in the partially unclassified declaration[7] on the potential impacts of

---

[6] Although the ACLU has sued the Departments of State and Justice, as well, the parties' briefing is focused solely on the Department of Defense.

[7] The declaration contains classified material, as well.  The Court has reviewed this material *ex parte* and *in camera*.  *See Wilner v. NSA*, 592 F.3d 60, 68 (2d Cir. 2009).

disclosing the existence *vel non* of updates to the Obama Administration's Presidential Policy Guidance.

She avers that the National Security Council classified the current status of the Obama Guidance in 2017, including whether it has been rescinded or updated "to avoid disclosing information to potential terrorist targets and other foreign adversaries about the process used by the U.S. Government to govern direct action against terrorist targets." Knight Decl. ¶ 12.  She explains that revealing that the Guidance has been updated could "allow[] potential terrorist targets to modify their operations to avoid detection or targeting by the U.S. Government." *Id.* ¶ 15.  "The more information that terrorists have about the standards and procedures currently in place," she writes, "the more easily they will be able to modify their behavior to avoid detection or targeting, or otherwise thwart military or intelligence operations." *Id.*

Knight also directly addresses the June 2019 disclosure of the report concerning the Niger ambush.  She asserts that any disclosure of the existence of updated presidential guidance in a Defense Department report does not carry the same weight as an official acknowledgment by the National Security Council or by another agency with the Council's authorization.  Knight Decl. ¶ 23.  She notes that adversaries of the United States monitor statements by the White House to learn about U.S. policy and that "foreign governments may feel compelled to respond to official White House statements of policy." *Id.*  Accordingly, she concludes, "[t]he asserted [Defense Department] disclosure does not eliminate the harms, described above, that could reasonably be expected to result from an official disclosure of the current status of the PPG." *Id.*

Knight's declaration contains four paragraphs of classified material, as well. █

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████



## II.   LEGAL STANDARDS

Courts almost exclusively resolve FOIA actions through the submission of cross-motions for summary judgment. *See NRDC v. U.S. Dep't of Interior*, 73 F. Supp. 3d 350, 355 (S.D.N.Y. 2014). "Summary judgment is appropriate only where the parties' submissions 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting Fed. R. Civ. P. 56(c)). "Where, as here, the parties have filed cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *N.Y. Times Co. v. U.S. Dep't of Defense*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

"The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v.*

*NSA*, 592 F.3d 60, 69 (2d Cir. 2009).  A district court reviews an agency's classification decision *de novo.*  5 U.S.C. § 552(a)(4)(B).  In its analysis, a district court must ultimately determine whether the exemptions invoked by the agency are "logical and plausible."  *Florez v. CIA*, 829 F.3d 178, 185 (2d Cir. 2016).

In this case, the agencies have given what is known as a "*Glomar* response."[8]  *See Wilner*, 592 F.3d at 68.  Just as if the agencies were seeking to withhold a document, the agencies must invoke one of the nine exemptions to the FOIA to preclude acknowledgment of the existence of the purported documents at issue.  *Id.*  "In evaluating an agency's *Glomar* response, a court must accord 'substantial weight' to the agency's affidavits, provided that the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of bad faith."  *Id.* (internal quotation marks and citations omitted).  Nevertheless, a *Glomar* response is "justified only in unusual circumstances, and only by a particularly persuasive affidavit."  *Florez*, 829 F.3d at 182 (quotation marks and internal citation removed).

## III.   DISCUSSION

In this case, the agencies argue that they properly invoked FOIA Exemption 1 and 3 when they refused to confirm or deny the existence of updates to the Obama Guidance. Besides objecting to those invocations in the first instance, both the ACLU and the *Times* claim that the Defense Department officially disclosed the information at issue in the Niger ambush report.  They further argue that any rationale for continuing to withhold the status of the Obama Guidance was undermined with the release of the report.

The Court finds the information at issue, when viewed on its own, was properly withheld under Exemption 1.  But the Niger ambush report "shift[ed] the factual

---

[8] "The term '*Glomar* response' refers to a response that neither confirms nor denies the existence of documents responsive to the request.  The term arises from the CIA's successful defense of its refusal to confirm or deny the existence of records regarding a ship named the *Hughes Glomar Explorer* in *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1011 (D.C. Cir. 1976)."  *Florez*, 829 F.3d at 181 n.2 (quotation marks and internal citations omitted).

groundwork" on which the Court examines the propriety of the FOIA Exemptions. *Florez v. CIA*, 829 F.3d 178, 186 (2d Cir. 2016). Although disclosure of the report does not qualify as an "official disclosure" that would waive the agencies' ability to invoke Exemption 1, it does make the continued use of that exemption illogical and implausible. Accordingly, the Court GRANTED the plaintiffs' motions for summary judgment and DENIED that of the agencies.

### A. Propriety of the Original Classification

The agencies in these cases invoke FOIA Exemptions 1 and 3, 5 U.S.C. §§ 552(b)(1) and (3). Viewing the agencies' reasons for those exemptions on their own, the Court finds that only Exemption 1 was properly invoked when the agencies first answered the ACLU's complaint in February 2018 — critically, before the release of the Niger ambush report.

#### *1. Exemption 1*

Put simply, Exemption 1 protects from disclosure material properly classified by executive order. *See N.Y. Times v. CIA*, 965 F.3d 109, 114 (2d Cir. 2020). The agencies claim that the current status of the Obama Guidance, and therefore the existence of any update by the Trump Administration, is properly classified under Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009). That order lists four conditions for classification:

> (1) an original classification authority is classifying the information;[9]
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected

---

[9] In the context of Executive Order 13526, an original classification authority is any official who may decide whether information ought to be classified. *See* EO 13526 § 1.3 (allowing either the President, Vice President, or an agency head to delegate that authority). In this case, an unnamed official at the National Security Council served in that role. Knight Decl. ¶ 12.

> to result in damage to the national security, which includes de-
> fense against transnational terrorism, and the original classifica-
> tion authority is able to identify or describe the damage.

*Id.* § 1.1(a); *see also N.Y. Times*, 965 F.2d 109 at 114.  In her declaration, Knight avers

that all four criteria have been met.  Knight Decl. ¶¶ 13–14.  Neither the ACLU nor the

*Times* contest the first three conditions.

The plaintiffs do argue, however, that Knight's reasons for keeping the existence

of any Trump Administration update to the Obama Guidance secret are illogical and

implausible.  In the public version of her declaration, Knight argues that revealing the

existence of updates to the Obama Guidance could allow adversaries to avoid detection

by the U.S. Government, although she does not detail how.  Alone, this public declaration

would be insufficient to show that the agencies' invocation of Exemption 1 was logical

and plausible.  *Cf. Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999) (rejecting a *Vaughn*

index — akin to a privilege log — due to the supporting affidavit's "vague and

conclusory" nature).

The Court has reviewed the classified version of the report, however, and is

satisfied with the reasoning offered therein.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  This is a

logical and plausible explanation of the dangers disclosure could pose.

Accordingly, given the "deferential posture in FOIA cases regarding the uniquely

executive purview of national security," *Wilner v. NSA*, 592 F.3d 60, 76 (2d Cir. 2009)

(internal quotation marks and citation omitted), the Court finds that the agencies have

shown that their conclusion that potential harm to the national security could result if the

existence of updates to the PPG are disclosed is logical and plausible.

2. *Exemption 3*

The same does not hold true for Exemption 3. "Exemption 3 applies to records 'specifically exempted from disclosure by statute.'" *N.Y. Times*, 965 F.3d at 115 (quoting 5 U.S.C. § 552(b)(3)). The parties agree the National Security Act of 1947, 50 U.S.C. § 3024(i)(1), is such an exempting statute. *See N.Y. Times*, 965 F.3d at 115.

The parties disagree, however, that the information at issue here is covered by the National Security Act, which "mandates that the Director of National Intelligence 'shall protect intelligence sources and methods from unauthorized disclosure.'" *N.Y. Times*, 965 F.3d at 115 (quoting § 3024(i)(1)). To properly apply the National Security Act, the agencies must show that it is "logical and plausible" that non-disclosure would "protect[] our intelligence sources and methods from foreign discovery." *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 119 (2d Cir. 2014) (internal quotations and citations removed). Knight argues that "the current status of the PPG relates to intelligence sources and methods because revealing the existence or non-existence of updated guidance could undermine intelligence operations against transnational terrorist targets, which by their nature involve intelligence sources and methods." Knight Decl. ¶ 27. This is the agencies' only justification for non-disclosure under Exemption 3.

Unlike the reasons proffered for non-disclosure under Exemption 1, Knight's declaration is far too conclusory in this regard. In particular, the agencies argue that because disclosure could reduce the efficacy of *operations* that may involve the collection of intelligence, the information at issue relates to intelligence *sources and methods*, *i.e.*, the category of information protected by the National Security Act. Although the Court is aware of the "broad sweep" of the Act in protecting intelligence sources and methods, *CIA v. Sims*, 471 U.S. 159, 169 (1985), it is the burden of the agencies to educate the Court on the connection between those concepts within the context of this case. They have done so only through *ipse dixit*. As stated above, the Court credits the potential harm to national security of disclosure, but it does not see — through its review of the

13

classified and unclassified Knight Declaration — the connection between that harm and the disclosure of intelligence sources and methods protected by the National Security Act.

Neither of the two cases the Defense Department cites in support counsel otherwise. In *Sims*, the plaintiffs sought to gain access to the names of individuals and organizations associated with the Central Intelligence Agency's MKULTRA project. The Supreme Court held that the entities were "intelligence sources" within the meaning of the National Security Act and therefore protected from disclosure. 471 U.S. at 173–74. And in *ACLU v. U.S. Department of Justice*, the Second Circuit found that records and photographs of interrogations related to an intelligence method, and therefore protected by the National Security Act. 681 F.3d 61, 75, 76 (2d Cir. 2012). In both cases, disclosing the information at issue would have revealed something about how the CIA collected intelligence. Here, based on the Court's review of Knight's declaration, disclosing the existence of updated guidance would reveal nothing of the sort. Accordingly, the Court finds that the agencies did not properly invoke Exemption 3.

### B. The Official Disclosure Doctrine

The Court now turns to the plaintiffs' first response to the Defense Department's use of Exemption 1: that the Department has officially acknowledged changes made to the Obama Guidance in the Niger ambush report. The Defense Department argues in reply (1) that the information disclosed is not the same as that sought by the plaintiffs, and (2) that the disclosure in the report was not "official" because the Defense Department was not authorized by the National Security Council to declassify the information in question. Although the Court finds that the information disclosed is as specific as and matches the information the plaintiffs seek, the Defense Department's actions did not waive its ability to invoke the exemption.

The official disclosure doctrine prevents an agency from invoking FOIA Exemption 1 after the government has, as the name of the doctrine suggests, officially disclosed the information sought. *See Osen LLC v. U.S. Cent. Command*, 969 F.3d 102,

14

109 (2d Cir. 2020).  In the Second Circuit, "[c]lassified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (internal quotation and alterations omitted).  "All three prongs of the *Wilson* test must be met before an agency will be deemed to have officially disclosed classified information." *Osen*, 969 F.3d at 109.

### 1. *Specificity & Matching*

"[F]or information to be 'as specific as' that which was previously disclosed, there cannot be any substantive differences between the content of the publicly released government documents and the withheld information." *Osen*, 969 F.3d at 110 (internal quotation and alterations omitted).  As for the second prong of the official disclosure test, "there must be enough of an overlap in subject matter between disclosed and withheld records to fairly say that the two records 'match' — in other words, that they present the same information about the same subject." *Id.* at 112.  "In the *Glomar* context . . . if the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue — the existence of records — and the specific request for that information." *Wolf v. CIA*, 473 F.3d 370, 379 (D.C. Cir. 2007).

The Defense Department argues that the information requested by the ACLU and the *Times* is not the same as that mentioned in the report about the Niger ambush principally because of differing titles.  The report discusses a "PSP" that "supersedes the CT-PPG," and, although "CT-PPG" is defined as "Counterterrorism-Presidential Policy Guidance" in the report, "PSP" is never defined.  Furthermore, the full title of the Obama Guidance is "Procedures for Approving Direct Action Against Terrorist Targets Located Outside the United States and Areas of Active Hostilities," while the full title of the CT-PPG referenced in the report is "U.S. Policy Standards and Procedures for the use of

force in counterterrorism operations outside the United States and areas of active hostilities." Because of these ambiguities, the Department argues, an adversary may still wonder if the Obama Administration's policies on the use of direct action abroad were *truly* revised.

The Defense Department's argument is contradicted by the report itself. The report notes that the Obama Administration released an unclassified fact sheet outlining the CT-PPG. And as discussed above, on May 23, 2013, the Obama Administration issued an unclassified fact sheet for the PPG. It further notes that the "core principle" of the PSP "remains the same" as that of the CT-PPG: that decisions to use U.S. forces in direct action missions would be made "at the most senior levels after reasonable review and considerable oversight." Hogle Decl. ex. 2.7 at 109. It can be fairly said that the Obama Guidance, which set up a rigorous process for reviewing and approving direct action missions that ended with the President, also involved approval at the most senior levels. Additionally, and most persuasively, Gen. Waldhauser referred to the Obama Guidance as the "CT-PPG" in Congressional testimony in 2017.[10]

Furthermore, the FOIA request submitted by the ACLU, at least, does not limit itself to updates to the Obama Guidance alone. Rather, the ACLU asks for "the record containing the Trump administration's rules governing the use of lethal force abroad," regardless of the title it may bear. ACLU FOIA Request at 5–6. The record discussed in the Niger ambush report specifically discloses that the PSP supersedes previous guidance regarding the use of direct action by U.S. forces, and it therefore is responsive to the ACLU's request. An interpretation that suggests otherwise would require a purposeful distortion of the report's plain meaning. The information in the report is as specific as,

---

[10] *See DOD Authorization for Appropriations for Fiscal Year 2018 and the Future Years [sic] Defense Program: Hearing before the S. Comm. on Armed Servs.*, 115th Cong. 448 (Mar. 9, 2017) (statement of Gen. Thomas D. Waldhauser), https://www.govinfo.gov/content/pkg/CHRG-115shrg39567/html/CHRG-115shrg39567 htm (Question 24).

and matches the information the ACLU and the *Times* seek here. The Court now turns to the final step in the *Wilson* test.

## 2. *Official Disclosure*

The third factor of the *Wilson* test "acknowledges 'a critical difference between official and unofficial disclosures . . . .'" *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). In *Wilson*, the Second Circuit observed that "the law will not infer official disclosure of information *classified by* the CIA from (1) widespread public discussion of a classified matter; (2) statements made by a person not authorized to speak for the Agency; or (3) release of information by another agency, or even by Congress." 586 F.3d at 186–87 (internal citations omitted and emphasis added). The Defense Department urges the Court to view this language as dispositive of this matter, arguing that the law should similarly not infer official disclosure of information classified by the National Security Council from release of information by the Defense Department.

But this interpretation leaves out crucial context, as the facts of *Wilson* make clear. In that case, the CIA's Retirement and Insurance Services Division sent a letter discussing retirement benefits to an employee who had recently resigned. 586 F.3d at 177–78. The employee then disclosed the letter to a member of Congress, *id.* at 178, who in turn published a redacted form of the letter in the *Congressional Record*, *id.* at 180. Later, the employee argued that the CIA's transmission of this letter to her and the subsequent publication of the letter by the member of Congress amounted to an official disclosure, thereby allowing her to discuss the information in a book. *Id.* at 191. The Second Circuit rejected this argument, holding (1) that the letter itself was not a disclosure because it was sent to a former employee bound by a confidentiality agreement, and (2) that the former employee's own disclosure could not bind the CIA. *See id.* at 188–91. It further found — while determining whether the rationale for continued classification was still logical and plausible in the face of public discussion —

that the letter was not an "official" disclosure, noting that "a bureaucratic transmittal from the CIA's personnel department to a former employee is hardly akin to the CIA director personally reading relevant information into the Congressional Record, as took place in *Wolf v. CIA*, [473 F.3d 370, 379 (D.C. Cir. 2007)]." *Id.* at 195.

The *Wilson* panel was determining (1) whether the CIA could be forced to acknowledge the fact of the former employee's engagement with the Agency — a fact the Agency had classified — despite third-party disclosures, and (2) whether the disclosures undermined the continuing rationale for classification. Its analysis did not turn at all on the fact that the CIA was the *classifying* agency. Rather, it turned on whether the CIA was the *disclosing* agency and, if not, on whether the disclosure left anything for the CIA to protect. Accordingly, *Wilson*'s prohibition against inferring acknowledgment by one agency due to the disclosure of another is inapplicable here.[11]  In this case the Court must

---

[11] Furthermore, none of the cases the panel cited in support grapple at all with the identity of the classifying agency:

- *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (noting "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption" and discussing whether CIA Director's congressional testimony amounted to official disclosure by CIA);

- *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) (observing that "widespread media and public speculation" would not create inference of official disclosure and examining whether disclosures in CIA or State Department cables bound the State Department);

- *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The mere fact that the CIA voluntarily transmitted an official document to a congressional committee does not mean that the Agency can thereby automatically be forced to release any number of other documents.");

- *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421–22 (2d Cir. 1989) (holding that a retired rear admiral's statements cannot bind the Navy);

- *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (examining whether a statement by the Office of Personnel Management could bind the CIA and holding "only the CIA can waive its right to assert an exemption to FOIA"); and

- *Earth Pledge Found. v. CIA*, 988 F.Supp. 623, 628 (S.D.N.Y. 1996) (observing that confirmation of a CIA installation by a Senate report does not prevent the CIA from issuing a *Glomar* response regarding that same information), *aff'd* 128 F.3d 788 (2d Cir. 1997).

determine whether the Defense Department's official disclosure may be inferred from the Defense Department's *own* release of information — not that of a third party.[12]

Nevertheless the record does not contain enough support for the Court to determine that the disclosure in the Niger ambush report was "official." "It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it *officially* to say that it is so." *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (emphasis added). In a 1975 case, the Fourth Circuit suggested that the determination of whether a disclosure is official involves some analysis of whether the officials in question intended to disclose the information. *See Knopf*, 509 F.2d at 1369 (noting in *dicta* that instances of "declassification by official public disclosure" came about as a "result of high level executive decisions that disclosure was in the public interest.").

The circumstances of the disclosure of this information are too attenuated for the Court to deem it "official." As Knight observed in her declaration, the mention of the update to the Obama Guidance was an "oblique reference" limited to one paragraph in a

---

[12] For this reason, many of the cases cited by the parties offer little guidance to the Court. For example, in *Frugone v. CIA*, the D.C. Circuit declined to direct the CIA to confirm or deny the former employment of a Chilean resident simply because the Office of Personnel Management had indicated his records were held by the CIA. 169 F.3d 772, 773, 775 (D.C. Cir. 1999). Contrary to the Defense Department's assertion, it does not stand for the proposition "that a disclosure made by an agency other than the agency that originally classified information was not an official disclosure." Doc. 31 at 17. Rather, it stands only for the proposition "that only the CIA can waive its right to assert an exemption to FOIA." 169 F.3d at 775.

Similarly, the Second Circuit found in *Florez v. CIA* that, although disclosures by the Federal Bureau of Investigation were relevant to whether continued classification was logical and plausible, those disclosures did not operate as waiver under the official acknowledgement doctrine. 829 F.3d 178, 183 (2d Cir. 2016). Like *Frugone*, it does not bear on the relevancy of the classifying agency's identity.

Nor does the Court find instructive *Ameziane v. Obama*, cited by the ACLU. 699 F.3d 488 (D.C. Cir. 2012). In that case, the D.C. Circuit found that foreign governments might view statements made in a district court's order or by a defense attorney in open court as official acknowledgement of information designated confidential by a State Department task force. *Id.* at 492. *Ameziane*, however, was not a case about the FOIA. Rather, it considered the criteria for unsealing unclassified documents designated confidential by a protective order. *Id.* at 494–95. The Court does not read it to bear at all on the waiver analysis here.

voluminous report that extensively covered a different topic — the ambush of U.S. soldiers in Niger.  Knight Decl. ¶ 23.  Maj. Gen. Cloutier supervised a team of investigators that authored the report, and then he transmitted that report to Gen. Waldhauser in late January 2018.  Waldhauser approved the report and added his own comments, none of which addressed the mentioned changes to the Obama Guidance.  He next sent the report with his comments to the Secretary of Defense in February 2018, again not acknowledging the changed guidance.  *Then*, sixteen months passed before a Defense Department spokesperson sent the report to a collection of journalists in June 2019.

The manner in which the Defense Department published this information stands in sharp contrast to cases in which a court found that a disclosure was official.  For example, a disclosure is "official" when an agency leader reads information into the *Congressional Record*, as the CIA director did in *Wolf v. CIA*, 473 F.3d 370, 379 (D.C. Cir. 2007). *Accord Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009) (identifying the *Wolf* disclosure as "official").  At the other end of the spectrum are the facts of *Wilson*, where the Second Circuit observed that "bureaucratic transmittal from the CIA's personnel department to a former employee" did not amount to an official disclosure.  *Wilson*, 586 F.3d at 195.

This case has more in common with the latter situation than the former for two reasons.  *First*, it shares the circuitous route the information took in *Wilson*, where the information was sent to a former employee, who then sent it to a member of Congress, who *then* published it in the *Congressional Record*.  *Id.* at 177–80.  And, *second*, neither the disclosures by the agency in *Wilson* nor those in this case reflect affirmative "high level executive decisions that disclosure was in the public interest."  *Knopf*, 509 F.2d at 1369.  As determined from the face of the report, the purpose of the disclosures in the Niger ambush report was to communicate the findings and recommendations coming from an investigation into the Niger ambush, *not* to discuss changes to the direct-action rules created by the Obama Administration.  This finding is underscored by the decision

of the National Security Council to classify the status of the Obama Guidance in 2017, which suggests that the high-level executive decisions had been *against* disclosure, not in favor of disclosure.

To be sure, finding that a Defense Department report authored by a major general and approved by the leader of a U.S. combatant command is not "official" approaches being a distinction without a difference. But this decision — an admittedly close one — comports with the principle behind the official doctrine. It is a doctrine of waiver, "a *privilege* reserved to the agency asserting a *Glomar* response." *Florez v. CIA*, 829 F.3d 178, 186 (2d Cir. 2016) (emphasis added). To allow an ancillary disclosure such as this one to force the Defense Department to waive an exemption could turn future FOIA suits into a game of "gotcha," allowing the decision of one subset of an organization to lead to the release of information potentially harmful to national security. *Cf. Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 177 (2d Cir. 2020) (Menashi, J., concurring) (predicting that imputing waivers among sub-agencies could "add unnecessary administrative burden" and cautioning against "compound[ing] that burden through judge-made doctrines . . . that fail to take account of the legal framework that governs FOIA administration"). Indeed, a similar concern animated the D.C. Circuit in *Frugone v. CIA*, where it observed that too loosely recognizing a disclosure as official could allow one organization without any duty related to national security to "obligate agencies with responsibility in that sphere to reveal classified information." 169 F.3d 772, 775 (D.C. Cir. 1999).[13]

---

[13] To be fair, the facts causing the *Frugone* court's concerns involved one agency's actions potentially binding an entirely different agency through its disclosures. Although the Court faces only the actions of the Department of Defense in this case, the Department is hardly monolithic and encompasses a wide variety of missions — strictly construing the official disclosure doctrine is still merited. *See Osen*, 969 F.3d at 117–18 (Menashi, J., concurring) (noting "nineteen components that have their own FOIA programs, including a FOIA appellate authority, and thirteen additional components that have their own FOIA programs and a consolidated appellate authority" in the Defense Department (internal quotations omitted)).

The official disclosure test as articulated in *Wilson* is "precise and strict." *N.Y. Times v. CIA*, 965 F.3d 109, 116 (2d Cir. 2020). Though the Court is presented with a close question by the facts of this case, it finds that the disclosures contained in Finding 2 of the Niger ambush report were not "official" and so holds that the Defense Department did not waive its ability to invoke Exemption 1. That is not, however, the end of the Court's inquiry.

### C.  Continued Propriety of Exemption One

In *Florez v. CIA*, the Second Circuit held that information that does not serve to waive an agency's ability to invoke a FOIA exemption can still be relevant for determining whether that invocation remains logical and plausible. 829 F.3d 178, 186 (2d Cir. 2016). In other words, even if a disclosure is not "official" under the *Wilson* test, "such [a] disclosure may well shift the factual groundwork upon which a district court assesses the merits" of a FOIA exemption. *Id.* The Niger ambush report has indeed shifted that groundwork. Given the report's authorship and import, the Court finds that confirming or denying the existence of updated guidance regarding direct action cannot still "reasonably [] be expected to result in damage to the national security." EO 13526, 75 Reg. 707, § 1.1(a)(4) (Dec. 29, 2009).

Much of the Court's conclusion in this regard stems from the unchallenged credibility of the report. It was authored by Maj. Gen. Cloutier and was transmitted to the Secretary of Defense by the commander of U.S. Africa Command, Gen. Waldhauser. One of the report's findings was that actions of U.S. forces conflicted in some respects with both the Obama Guidance *and* the subsequent updates. One of its recommendations was that U.S. Africa Command should issue guidance that could help brings its operations more in line with "Presidential Policy as it relates to U.S. direct action" — again, the subject matter of the guidance and supposed updates at issue here. Waldhauser acknowledged in his message to the Secretary that his forces operated in accordance with presidential guidance and that it was crucial that his commanders understand their

decision-making authorities as they operate under that guidance.  Although the Court has found that the Defense Department did not intend to make an official disclosure regarding updates to the Obama Guidance, *see supra* Part III.B.2, the reference to updated guidance regarding direct action against suspected terrorists is a necessary and explicit part of the report's findings and recommendations.  Put simply, the Niger ambush report has credibly and conclusively established that the Obama Guidance has been superseded.  No "increment of doubt" remains. *Wilson*, 586 F.3d at 195.

The Defense Department, through the Knight Declaration, presents two reasons for continued withholding of the status of the Obama Guidance: *first*, that a foreign government might be more compelled to respond to an official disclosure by the White House — of which the National Security Council is a part — than to this Defense Department disclosure, and, *second*, that an adversary may still have lingering doubts over the accuracy of the report without official confirmation through this lawsuit.  As with the Defense Department's efforts to justify the invocation of Exemption 3, the first argument against disclosure, which is based on the speculated response by foreign governments, is far too conclusory.  Notably, Knight's unclassified declaration does not explain why a foreign government might find a White House confirmation of updated guidance regarding rules governing military operations more worthy of response than a Defense Department confirmation of the same information.[14]

The Department's second argument — that confirming or denying the existence of updated guidance despite the report's disclosure could allow adversaries to better inform their efforts to avoid U.S. direct action — is similarly unfounded.  In reality this report, spurred by the ambush and death of four U.S. soldiers and four of their allies, was the result of an official investigation that spanned five countries and involved interviews with

---

[14] Nor does the Court's review of the classified portion of Knight's declaration counsel a different result. ████████████████████████████████████████████████████

143 witnesses. When transmitting the report to the Secretary of Defense, the commander of U.S. Africa Command specifically pledged to process it "for necessary declassification" and FOIA purposes. Hogle Decl. ex. 2.1. Nothing in the record suggests that such an extensive military investigation, authored and approved by such high-level military officials, concerning the rules for high-stakes military operations, could leave any doubt in the mind of any reasonable observer regarding the existence of updated guidance confirmed therein.[15] Indeed, neither Knight in the unclassified portions of her declaration[16] nor the Defense Department in its briefing suggest that the authors of the report were in any way unqualified to say that the presidential guidance had changed or were at all more unreliable than confirmation through the White House itself.[17] Even though the Court must accord the Defense Department and its submissions deference in matters of national security, *see Wilner v. NSA*, 592 F.3d 60, 76 (2d Cir. 2009), to accept its claim that there is anything left to hide would be to give in to "a fiction of deniability that no reasonable person would regard as plausible." *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013) (Garland, C.J.).

## IV.    CONCLUSION

For these reasons, the Court finds that the Defense Department never properly invoked Exemption 3 and that its invocation of Exemption 1 was rendered illogical and

---

[15] For this reason, the report is a far cry from the "compilation of speculation from non-governmental sources" published by the National Science Foundation regarding the *Glomar Explorer* itself, *see Military Audit Project v. Casey*, 656 F.2d 724, 743 (D.C. Cir. 1981) or even the expert opinion of a recently retired rear admiral, *see Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 421 (2d Cir. 1989).

[16] The classified portion of the Knight Declaration does not convince the Court otherwise. ███████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[17] In any event, ruling in the plaintiffs' favor here would not involve the White House or the National Security Council at all; it would be the Defense Department confirming or denying the existence of updated guidance. Any fear that the National Security Council could then be forced into making its own disclosures is unfounded as it is not subject to the FOIA. *See Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 552 (2d Cir. 2016).

implausible by the release of the Niger ambush report.  Accordingly, the agencies' motion

for summary judgment was DENIED, and the cross-motions of both the ACLU and the

*Times* were GRANTED.  The instructions within the Court's Order of September 29,

2020, Doc. 39, remain in effect.


Dated: October  5  , 2020
New York, New York

EDGARDO RAMOS, U.S.D.J.